# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

| | |
|---|---|
| **TABORIS JONES,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | **NO: 1:20-CV-00084** |
| **v.** ) | **JUDGE CAMPBELL** |
| ) | **MAGISTRATE JUDGE HOLMES** |
| **RAYMOND BYRD, WARDEN,** ) | |
| ) | |
| **Respondent.** ) | |

## MEMORANDUM OPINION

Pending before the Court is Taboris Jones's pro se petition under 28 U.S.C. § 2254 for a writ of habeas corpus challenging his 2015 conviction for one count of possession with intent to sell more than half a gram of cocaine within 1,000 feet of a school, one count of possession of marijuana, and one count of improper display of a registered license plate. *See State v. Jones*, No. M2015-02515-CCA-R3-CD, 2017 WL 2493684, at *1 (Tenn. Crim. App. June 9, 2017), *perm. appeal denied,* (Tenn. Nov. 16, 2017). Jones is an inmate of the South Central Correctional Facility in Clifton, Tennessee, where he is currently serving a sentence of fifteen years of imprisonment for the cocaine charge and ten days for simple possession of marijuana. *Id.*

Respondent Raymond Byrd has responded to the petition. (Doc. No. 16). Petitioner has filed a Reply to the Response. (Doc. No. 19). The petition is ripe for review, and this Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that an evidentiary hearing is not needed, and Petitioner is not entitled to relief. The petition therefore will be denied and this action will be dismissed.

1

# I. PROCEDURAL HISTORY

The Maury County Grand Jury indicted Petitioner on one count of possession with intent to sell more than half a gram of cocaine within 1,000 feet of a school; one count of possession of marijuana; and one count of improper display of a registered license plate. *See State v. Jones*, No. M2015-02515-CCA-R3-CD, 2017 WL 2493684, at *1 (Tenn. Crim. App. June 9, 2017), *perm. appeal denied*, (Tenn. Nov. 16, 2017). Petitioner pleaded guilty to the marijuana possession and traffic offense but proceeded to trial on the cocaine offense. *Id*. The jury convicted Petitioner as charged. *Id*. The trial court applied the Drug Free School Zone Act to enhance Petitioner's sentence and sentenced Petitioner to concurrent sentences of fifteen years and ten days for the cocaine and marijuana convictions respectively. *Id*.

Petitioner appealed his cocaine conviction to the Tennessee Court of Criminal Appeals ("TCCA"). *Id*. at *5. The TCCA affirmed the judgment. *Id*. at *1. Petitioner applied for discretionary review in the Tennessee Supreme Court, but the court denied his application. *See id*. at *1.

Petitioner subsequently filed a timely pro se petition for post-conviction relief. *Jones v. State*, No. M2019-00711-CCA-R3-PC, 2020 WL 528029 (Tenn. Crim. App. Feb. 3, 2020), *perm. appeal denied*, (Tenn. July 17, 2020).The post-conviction court appointed counsel, who filed an amended petition. *Id*. at *3. Following an evidentiary hearing, the post-conviction court denied relief. *Id*. at *3, 11-12.

On appeal of the denial of post-conviction relief, the Tennessee Court of Criminal Appeals affirmed. *Id.* at *1. The Tennessee Supreme Court declined discretionary review. (Doc. No. 15, Attach. 22 at PageID# 1197).

On December 28, 2020, the Court received Petitioner's initial petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. No. 1). On March 1, 2021, the Court received a second habeas petition from Petitioner. (Doc. No. 6). The Court then directed Petitioner to clarify on which petition he wanted to proceed (Doc. No. 7), and Petitioner decided to proceed on the second and instant petition. (Doc. No. 8). By Order entered on April 19, 2021, the Court directed Respondent to file an answer, plead, or otherwise respond to the petition in conformance with Habeas Rule 5. (Doc. No. 9). Respondent filed a Response on September 23, 2021, conceding that the operative petition is timely and urging the Court to dismiss the petition. (Doc. No. 16 at PageID# 1198-99).

Petitioner asserts thirteen grounds for relief, some of which contain multiple claims and subclaims and some of which repeat claims raised in other grounds:

1. Ground Two: denial of the right to an impartial jury (Doc. No. 6 at PageID# 51);

2. Grounds Two and Three: denial of due process rights (*Id*. at PageID# 51-52);

3. Ground Four: lack of notice that the State planned to use Petitioner's prior convictions against him during his trial (*Id*. at PageID# 52);

4. Ground Four: the trial court asked Petitioner in front of the jurors if he was going to testify and Petitioner "was never given a chance to answer" because his attorney answered "without [Petitioner] having any input" (*Id*.);

5. Trial counsel provided ineffective assistance of counsel by

    a. Ground One: failing to investigate the K-9 and its handler (*Id.* at PageID#50);

    b. Ground Five: failing to properly investigate the case (*Id*. at PageID# 53-54);

    c. Ground Four: stating that Petitioner was going to testify for the defense
       without allowing Petitioner any input on this decision (*Id*. at PageID# 53);

    d. Ground Four: failing to give notice of impeaching convictions (*Id*.); and

3

e. Ground Five: failing to request a bill of exception (*Id.*);

6. Ground Twelve: post-conviction counsel provided ineffective assistance (*Id.* at PageID# 58);

7. Ground Six: Petitioner was illegally arrested due to an "invalid instrument of justice" (*Id.* at Page ID# 54);

8. Ground Seven: there was a hearsay violation based on Tennessee Rule of Evidence 801 concerning the arresting officers' testimony (*Id.* at Page ID# 55);

9. Ground Eight: the trial court forced Petitioner to plead guilty in front of the jury (*Id.* at Page ID# 55);

10. Ground Nine: the prosecutor "was allowed to lead the entire trial[,]" which violates "Rule of Evidence 611" (*Id.* at Page ID# 56);

11. Ground Ten: the trial court was biased against the defense (*Id.* at Page ID# 56-57);

12. Ground Eleven: the Drug-Free School Zone Act "is unconstitutional" because it violates the Tennessee Sentencing Reform Act of 1989 and the Eighth Amendment's prohibition against cruel and unusual punishment (*Id.* at Page ID# 57); and

13. Ground Thirteen: miscellaneous allegations (*Id.* at PageID# 58).

## II.  SUMMARY OF THE EVIDENCE

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's trial as follows:

> At approximately 8:30 p.m. on April 7, 2014, Officer Jason Lovett of the Spring Hill Police Department was traveling eastbound on West Seventeenth Street when he observed a black Chevrolet truck at the four-way stop of the intersection of West Seventeenth Street and Highland Avenue in Columbia. Officer Lovett noted that Highland Park Elementary was in the area of the intersection. The parties stipulated at trial that Highland Park Elementary School met the statutory definition of a school pursuant to the Drug Free School Zone Act. At the time, Officer Lovett was

4

driving an unmarked unit and was assigned to the Maury County Drug Task Force. He had been investigating illegal narcotics since 2007.

Officer Lovett testified that the vehicle came to a complete stop at the intersection and turned right onto West Seventeenth Street which placed the truck in front of Officer Lovett. As Officer Lovett followed the truck, he noticed that there was no light illuminating the tag of the vehicle. Officer Lovett radioed Deputy Joey Parks, his "backup" officer, and initiated a traffic stop near the water tower across from a mobile home park. Officer Lovett approached the vehicle and asked the driver, identified as Defendant, for his driver's license, registration, and proof of insurance. Defendant gave Officer Lovett his driver's license, and Officer Lovett took the license back to his patrol car to check on its status, and he checked the status of Defendant's license plate. As Officer Lovett was checking the information, Deputy Parks walked up to Defendant's truck and asked him to step out of the vehicle. Defendant got out of his truck and stood in front of Officer Lovett's car with Deputy Parks. Officer Lovett heard Deputy Parks request consent to search Defendant truck, and Deputy Parks asked Defendant if there was anything illegal inside the vehicle. Officer Lovett testified that Defendant became "extremely irate." He said that Defendant began cursing and said that he was only pulled over because he was black.

When asked if Defendant consented to a search of his vehicle, Officer Lovett testified: "Not that I'm aware of. It just got so bad the way he was acting and stuff. To me, it was prolonging things." At that point, Officer Lovett ran his canine dog Abbi, who is a certified narcotics detection dog, around Defendant's truck. Abbi alerted on the driver's side door seam by scratching at the door. Officer Lovett placed Abbi back in his vehicle and informed Defendant that he was going to search Defendant's truck because the dog had detected a "narcotic odor" in the vehicle.

As Officer Lovett began searching Defendant's truck he heard Deputy Parks yell, "he's running." Officer Lovett began chasing Defendant and eventually lost sight of him near Chevy White's parking lot, and Officer Lovett stopped running. Deputy Parks had returned to his vehicle and alerted other officers to be on the lookout for Defendant. He also drove around the area looking for Defendant. Officer Lovett returned to Defendant's truck and continued his search. Underneath the driver's seat, he found a green pill bottle and a digital scale with a white powdered residue on it. Officer Lovett also found a marijuana blunt in the ashtray.

When Officer Lovett returned to his office he field tested the white residue on the scale, and it was presumptively positive for "cocaine base." The pill bottle contained one bag of "powder," and there was a second bag in the bottom of the bottle that "had a little bit of crumbs stuck inside of it." Officer Lovett also field tested residue in the pill bottle, and it was positive for "cocaine base." He then sent everything but the digital scale by Lieutenant Doelle to the Tennessee Bureau of Investigation (TBI) Crime Lab for testing.

Officer Lovett was tendered and qualified as an expert in the field of narcotics investigation. He was familiar with the common quantity of cocaine sold and purchased in the area and that the commonly sold amount or used amount is "a 20," which is a "20 rock." Officer Lovett testified that a 20 rock usually costs twenty dollars and weighs approximately 0.1 grams. He said, "It's a very minute amount. It just gives them enough fix. It's a quick get [sic] is what it is."

Officer Lovett testified that in reference to charging an individual for possession of cocaine for sale, he looks for multiple baggies, digital scales, and currency. He also checks the individual's phone to see whom they have been talking to. Officer Lovett testified that with respect to a "user," he looks for pipes. He said, "I'm actually looking for pushers, char broil, which is actually an S.O.S. pad." Officer Lovett testified that he found nothing in Defendant's vehicle for the use of cocaine. However, Defendant had everything that he needed to sell cocaine such as the digital scales and what Officer Lovett estimated to be three grams of cocaine. He did not know if Defendant had currency on his person because Defendant ran. Officer Lovett had never known of a cocaine user carrying a digital scale. As to the marijuana blunt, Officer Lovett testified that he seized it and charged Defendant with simple possession. He noted that the blunt had been used because "[y]ou could still smell the burn. Not that it was smoked that night, but you could tell that it was burnt marijuana." It was his opinion that Defendant was more of a seller of cocaine rather than a user.

On cross-examination, Officer Lovett testified that during the chase there were no comments about shots fired, and he did not throw anything at Defendant. He said that he lost his flashlight out of his hand while running and kicked it and that it probably went toward Defendant. He later walked back to the area to look for the flashlight. Officer Lovett did not see Defendant throw anything. He said that Defendant turned himself in approximately two days after the chase. Officer Lovett noted that the amount of cocaine in the green bottle may have been worth nearly $500. Deputy Parks' testimony was similar to that of Officer Lovett. He testified that Defendant said that he was upset because of an argument with his "significant other."

Special Agent Jennifer Sullivan of the TBI Crime Lab is a forensic scientist. She tested the substance submitted in the present case and determined that it was 3.03 grams of cocaine base.

William Doelle was a Lieutenant with the Maury County Sheriff's Office at the time of the offenses in this case. At the time of trial he was Director of the 22nd Judicial Drug Task Force. Director Doelle was tendered as an expert in the field of narcotics investigation. He testified that he took the evidence in the present case to the TBI Crime Lab and later picked it up. Director Doelle testified that he took some measurements near the Highland Park Elementary School. He testified:

Distance, the 149 feet, was from—there's a light pole here, an electric pole, here at the corner. This is 17th and Highland Avenue real close to the school right there. This is that corner, but this pole right here to the sign right here, this is the end of the school zone right here. This is, actually, Highland Park School. So from this sign that says "school zone" to there was 149 feet, according to the wheel that I used.

Director Doelle confirmed that the Google measurement for the same distance was 149.21 feet. He was aware of the location of the traffic stop in this case. Director Doelle testified that the distance from the corner of Highland Park Elementary School to the location of the traffic stop, past the mobile home park, based on Google Maps was 936 feet.

Director Doelle testified that he had handled more than one-thousand cases involving cocaine during his law-enforcement career. Based on his experience interviewing sellers and users of cocaine and conducting undercover drug buys, a person interested in purchasing cocaine for personal use does not commonly carry digital scales. Director Doelle testified that he looks at the amount of drugs, the packaging, and whether there is any drug paraphernalia to determine whether narcotic possession is for sale. He testified that users commonly have crack pipes, metal pipes, "char broil," pushrods, and numerous "Bic lighters." Director Doelle testified that sellers usually have scales and multiple bags.

Director Doelle testified that ninety percent of the crack cocaine sent to the crime lab "come[s] back with .1 grams on the weight on those rocks. So for every gram, you're getting ten rocks for every gram." He also said, "We paid $20 per rock to, you know, get .1 grams of crack cocaine." Director Doelle estimated that three grams of crack cocaine would produce "roughly 30 rocks." It was his opinion that a cocaine user would not leave the amount of residue in the green bottle found in Defendant's truck. He said, "They're going to smoke every bit of that that there is to scrape out of that, someone that's on crack cocaine."

On cross-examination, Director Doelle testified that he did not know the exact spot that Defendant was stopped, and he did not physically go to the area of East Seventeenth Street and inspect the area of the stop and calculate the distance from the school property line. He consulted a website called the "Tennessee Property Data" to determine the property line of the Highland Park Elementary School. Director Doelle agreed that if a line was drawn from all of the parks, schools, libraries, and daycares in Columbia, there would be many overlapping drug free zones in Columbia. He agreed that not everyone who possessed cocaine in the drug free zones possessed it with intent to sell.

Director Doelle agreed that an individual who purchased three grams of cocaine at one time would get a better price than someone who purchased .1 gram at a time. He testified that three grams of cocaine at one time could possibly be purchased for

7

$250 to $300. Director Doelle also agreed that a heavy crack cocaine user could use up to three grams of cocaine in a day to a day and a half. He acknowledged that not everyone with more than 0.5 grams of cocaine was selling it. On redirect examination, Director Doelle testified that in his experience, it was not common for someone to buy two to three grams of crack cocaine only for personal use.

Defendant testified that on April 7, 2014, he and his wife were renting a house in the Fox Run neighborhood on Kimberly Drive. He was employed by Southern Son's Paving Company. He also had a lawn care business. Approximately four months earlier, Defendant learned that he had a daughter who was nine years old. Defendant admitted that he was convicted of felony theft in 2007.

Defendant testified that he was driving his 2001 Chevrolet Silverado at the time of the stop on April 7, 2014. He explained he had been having problems with the truck prior to that night and that a couple of friends had been working on the vehicle for him. Defendant testified that he left the truck at Chris Sawyer's house a couple of weeks prior to April 7, 2014, and he also let other friends borrow his truck and trailer. He said that the vehicle usually sat in front of his house with the door unlocked. He thought that he owed approximately $800 on the vehicle. Defendant said that it had been a couple of weeks since he had driven the truck prior to being pulled over.

Defendant testified that his daughter called on April 7, 2014, and asked him to bring her some shoes. He waited for his wife to get home from work with the car because he did not want to drive the truck "at all." Defendant thought that his wife arrived home at approximately 7:00 p.m., and he said that she was "a little aggravated" when she arrived home. He said that his wife began complaining because he used her car too often because his truck was "out of commission." Defendant testified that he got into his truck and left to take his daughter her shoes.

Defendant testified that he was pulled over by two officers in an SUV at approximately 8:00 to 9:00 p.m. after turning right on West Seventeenth Street. He did not see a second SUV. He said that Officer Lovett asked for his license, registration, and insurance. Defendant testified that he gave Officer Lovett his license and registration but he had left proof of insurance at home. He said that he did not know that his "tag light" was not working on the truck.

Defendant testified that he was sitting in the truck getting paperwork together when Deputy Parks "pops up on the passenger's side" of the truck. He said that he felt scared, and he got out of the vehicle and began talking to Deputy Parks and asking if he had done anything wrong. Defendant testified that he noticed that his driver's license was sitting on the windshield wiper of Officer Lovett's SUV but he did not see Officer Lovett. He said that Deputy Parks was not answering his questions. Defendant further testified:

> Then he starts to explain to me we're vice, where are the guns at, we're vice, where are those guns at. He just kept on repeating that to me, where are those guns at. So I'm thinking to myself like why is he continuing to ask me about guns.

Defendant said that it was bothering him because Deputy Parks would not make eye contact with him and that Deputy Parks was asking him about "guns and stuff." Defendant then asked Deputy Parks if he was racist, and "when I said that, he got out of control." Defendant explained that Deputy Parks "was being demanding" which caused Defendant to feel "belittled."

Defendant testified that he then noticed the back door open up on the SUV, and "a dog coming out of the car." He said that Deputy Parks asked to search Defendant and his truck. Defendant testified that he agreed to let Deputy Parks search his person, and the officer pulled a receipt out of Defendant's pocket. Defendant did not have any drugs or weapons on his person. Defendant testified that he knew that there were two "marijuana roaches" in the ashtray of his truck. He said that he did not give the offices consent to search his truck.

Defendant testified that Deputy Parks told him that if the dog gave an alert, probable cause would exist to search Defendant's vehicle. Defendant said that he observed the dog run around his truck three times without alerting on the vehicle. After the dog finished its task, Officer Lovett placed the dog back in the SUV. Defendant testified that he then asked, [N]ow, can I get my ticket, take my daughter her things, so I can get ready for work in the morning?"

Defendant testified that he noticed that Officer Lovett was putting "gloves on or something," and Deputy Parks was looking at the ground. Defendant testified that at that point, Officer Lovett began searching his truck, and when Defendant said something about it, Deputy Parks said, "if you didn't ask me if I was a racist, I wouldn't be doing this to you." Defendant testified: "I looked, I said, I can see now that you-all are with [sic] something tonight and I ran for my life." Defendant described the direction that he ran and noted that he took action to avoid being tasered. He also said that one of the officers grabbed his jacket as he jumped over a fence. Defendant testified that Deputy parks threw a lighter at him and said that shots had been fired. He said that he noticed an opening in the fence behind "Chevy White's," and he circled back around to the street where his truck was parked. He said that the truck was sitting there with the door open, and no police cars were around. Defendant said that he ran from the officers because he was "sincerely scared." He denied knowing that the scales or cocaine were in the truck or how they got there. Defendant turned himself in to the Maury County Sheriff's Department two days later.

On cross-examination, Defendant admitted that the area where he was stopped is nowhere near Theta Park, the area where he was supposed to be taking shoes to his daughter. Defendant admitted that he drove beside Highland Park Elementary

School when he drove to the corner of Highland Avenue and West Seventeenth Street, which was well within 1,000 feet of the school zone. Defendant testified that the cocaine found in the truck did not belong to him, and he did not use crack cocaine.

Defendant testified that he did not hear officers tell him to stop or say anything else as he ran away. He said that he was not worried about the marijuana in his truck because it "was just two ends of the blunt, and there's no marijuana in it."

*State v. Jones,* No. M2015-02515-CCA-R3-CD, 2017 WL 2493684, at *1-5 (Tenn. Crim. App.

June 9, 2017).

The Tennessee Court of Criminal Appeals summarized the proof adduced at Petitioner's

post-conviction hearing as follows:

The Petitioner filed a June 30, 2017 pro se petition for post-conviction relief alleging ineffective assistance of counsel; the post-conviction court thereafter appointed counsel, and post-conviction counsel filed an amended petition on January 31, 2018, after our supreme court denied permission to appeal relative to the direct appeal. The amended petition raised numerous allegations of ineffective assistance, as well as the disproportionality of the Petitioner's fifteen-year sentence. Relative to the issues on appeal, the Petitioner challenged trial counsel's investigation of the case; counsel's effectiveness relative to presenting the defense at trial; and counsel's communication with the Petitioner, including announcing that the Petitioner would testify before the Petitioner had made that decision.

At the post-conviction hearing, Deputy Parks testified that he was not familiar with the Petitioner prior to his arrest. Deputy Parks agreed that he did not measure the distance between the traffic stop and the elementary school. He did not recall whether anyone asked the Petitioner for consent to search his truck and noted that he had not reviewed the case and did not remember anything specific about it. Deputy Parks did not know if the traffic stop was delayed "due to a potential outstanding warrant." Trial counsel did not discuss the case with Deputy Parks before trial. Deputy Parks did not order DNA or fingerprint testing on the seized items and did not know if other officers did so. Deputy Parks did not remember if a video of the traffic stop existed, and he noted that only some police vehicles were equipped with cameras. Deputy Parks stated that he drove a second police cruiser separate from Officer Lovett. He did not remember whether he had a police dog in his cruiser, and to his recollection, Officer Lovett's police dog performed the sniff search of the Petitioner's truck.

Deputy Parks testified that it was Officer Lovett's decision to conduct the sniff search and that Officer Lovett was the "primary" officer at the traffic stop. Deputy Parks noted that he and Officer Lovett worked together and that when one of them

10

initiated a traffic stop, the other would also respond. Deputy Parks stated that he asked the Petitioner about narcotics, "which led [him] to ask [the Petitioner] for a consent search." Deputy Parks did not perform a field test on the set of scales. After the police dog indicated the presence of contraband and Officer Lovett began to search the vehicle "up underneath the seat," the Petitioner "took off running." Deputy Parks attempted to "throw a [Taser]" at the Petitioner, and he noted that it was "typical procedure" to shock a fleeing suspect with a Taser when a police dog had indicated the presence of contraband. Deputy Parks did not remember whether he patted down the Petitioner, but he noted that he generally asked for consent to search a person and would perform a pat-down for weapons if the person refused. The search of the truck was performed partially before and partially after the Petitioner's flight. Deputy Parks agreed that there was no search warrant, that the Petitioner did not consent to the search, and that to the "[b]est [he] recollecte[d]," the Petitioner's truck was impounded. Deputy Parks did not remember if a felony evading arrest charge was dismissed in relation to this case. Upon questioning by the post-conviction court, Deputy Parks agreed that, generally, evading arrest on foot was a misdemeanor.

Officer Lovett testified that he was not familiar with the Petitioner before his arrest. He did not recall having asked the Petitioner about guns, but he noted that he generally asked motorists if they had illegal drugs or weapons in their cars. He did not know of a particular event that would have triggered a "heightened awareness" of guns on that night. Officer Lovett thought that Lieutenant Doelle4 measured the distance between the traffic stop and the elementary school after the issuance of the Petitioner's arrest warrant. Officer Lovett noted that the intersection where he first saw the Petitioner's truck was one hundred and fifty feet from the elementary school. Officer Lovett agreed that he asked for consent to search the Petitioner's truck; he did not remember if Deputy Parks searched the Petitioner. Officer Lovett was not aware of a delay during the traffic stop "due to an outstanding warrant that the system was showing that eventually was found not to exist."

Officer Lovett denied that trial counsel interviewed or communicated with him prior to trial. Officer Lovett stated that in "these cases," depending on the case, he might order DNA or fingerprint testing, particularly if multiple people were present in the car. Officer Lovett did not remember whether the Petitioner told him other people had been driving his truck. Officer Lovett's police cruiser was not equipped with a camera. He stated that it was his practice to conduct a police dog sniff search of vehicles during every traffic stop, including stops for an unilluminated license plate, and to call dispatch for a backup officer. Officer Lovett did not remember how long the traffic stop lasted before the Petitioner fled. Both Officer Lovett and Deputy Parks chased the Petitioner on foot.

Officer Lovett recalled that his police dog circled the truck twice, that it exhibited "changed behavior" on the first circle, and that it gave a "positive trained alert" on the second circle. No cash was found on the Petitioner at the time of his arrest. Officer Lovett agreed that if a person possessed cash, scales, or "other

paraphernalia," that it could be indicative of the person's selling drugs rather than using them. If Officer Lovett called Spring Hill, he would use his cell phone because his radio signal did not reach Maury County. Officer Lovett stated that he generally would have called police dispatch himself, but he noted that there was no rule against Deputy Parks's doing so. Officer Lovett indicated that the Petitioner had been charged with misdemeanor evading arrest because he fled on foot.

Trial counsel testified that he represented the Petitioner at trial and that another attorney represented the Petitioner at the preliminary hearing. The original charges were possession 0.5 grams or more of cocaine within one thousand feet of a school, simple possession of marijuana, and misdemeanor evading arrest. Counsel was unsure whether the Petitioner had been charged with failing to have an illuminated license plate, which was the basis of the initial traffic stop. The evading arrest charge was dismissed at the preliminary hearing. The Petitioner hired counsel in spring 2015, and counsel appeared in court in May, June, and July 2015. After being unable to settle the case, the Petitioner proceeded to trial on August 25, 2015. The Petitioner met with counsel at counsel's office when counsel was retained, at the Petitioner's three court appearances, and "once or twice" about one week prior to trial. Counsel also recalled speaking to the Petitioner on the telephone before trial. Counsel's meetings with the Petitioner before trial lasted about one hour each. When asked whether the length of meeting was typical of a Class A felony trial, counsel responded that it depended on the type of felony and the number of witnesses.

Trial counsel testified that the trial date was reset because he was attempting to obtain the police dispatch record of the calls Officer Lovett made to Spring Hill. Counsel issued a subpoena to Maury County 9-1-1 listing two dates, as set out in the officer's report and the indictment, and was told they did not have any records from those dates. Counsel subsequently issued a subpoena to the Spring Hill Police Department and received the same response. Counsel was unaware at the time that he had requested records from 2015 instead of 2014. Counsel had telephone conversations with the police department and the prosecutor regarding the dispatch records, and they were unable to find the relevant records. Counsel was searching for the records to determine if a suppression issue existed relative to a delay during the stop. Counsel did not ultimately file a suppression motion. Counsel noted that he sometimes filed suppression motions in drug cases involving traffic stops, citing case law that held where traffic stops were prolonged in order to conduct a police dog sniff search, the evidence was suppressed. Counsel stated that he did not believe a suppression issue existed in the Petitioner's case because the officers' testimony established that Officer Lovett was still waiting for the information check to come back when the sniff search was conducted. Counsel denied having read *State v. Levitt*, 73 S.W.3d 159 (Tenn. Crim. App. 2001), during his suppression research. Counsel stated that his grandfather worked in the area where the Petitioner's traffic stop occurred and that he was "very familiar" with the area. Counsel drove through the area after being hired in order to "see where [the Petitioner] had ran[.]" Counsel did not take any measurements, although he noted

that he knew the intersection of 17th Street and Highland, where Officer Lovett first saw the Petitioner's truck, was within one thousand feet of a school. Counsel acknowledged that if the Petitioner had driven sixty feet further, he would have been outside of the school zone.

Counsel testified that a plea offer existed for the Petitioner to serve eight years at thirty percent service in exchange for pleading guilty to Class B felony possession of cocaine in a "non-drug free zone." Counsel reviewed the offer with the Petitioner and advised him to take it, but the Petitioner did not wish to accept the offer. Counsel advised the Petitioner that was facing a fifteen-year sentence at one hundred percent service. The Petitioner "did not want to serve any time." The Petitioner maintained that other people had access to the car and that he did not know the cocaine was under the driver's seat of his truck. After the Petitioner's trial, he wrote counsel a letter asking if he could still accept the offer.

Trial counsel testified that although the Petitioner had prior convictions, they did not involve drugs. When asked whether a discussion with the Petitioner occurred regarding "the mere fact of driving through a drug-free zone [didn't] mean that [the Petitioner was] going to get convicted of an A felony[,]" counsel responded, "[The Petitioner] claimed that. I never told him that. I knew the status of the law at that point in time that merely driving through a drug-free zone is enough to sustain a conviction[.]" Counsel noted that he did not "like that law" and that the trial court commented during the motion for a new trial hearing that "he really didn't like the law either but that's the status of the law at the time." Counsel stated that he raised the issue of the law's application to the Petitioner in the direct appeal and that he applied for permission to appeal to our supreme court.

Relative to the direct appeal, trial counsel testified that he incurred $1,995 in out-of-pocket costs to have the transcript prepared after a series of administrative issues in which he failed to have the Petitioner declared indigent in time to be appointed as counsel.

Trial counsel raised on appeal the sufficiency of the evidence and "the main issue ... involving the drug-free zone." Counsel noted that his sufficiency argument "was not a strong argument" due to the presumption of possession for resale that arose from the amount of cocaine involved and the presence of scales in the truck. Counsel further noted that the two most damaging aspects of the case were the Petitioner's running from police, the quantity of cocaine, and the presence of cocaine residue on the scales. Counsel agreed that the Petitioner denied the cocaine was his but admitted to possessing the marijuana in the truck. Counsel stated that he cross-examined one of the officers about whether DNA or fingerprint testing had been done and that the officer testified that testing was not performed. When asked whether counsel would typically have requested independent evidence testing, he responded, "I guess I could have ... but it could have been picked up both ways, too. It could have been you get it tested and his fingerprints are on there and then the State's got even stronger proof."

13

Trial counsel denied knowing that the Petitioner had bipolar disorder and stated that the Petitioner never indicated having such a diagnosis. Counsel noted that the Petitioner never appeared to have "any kind of mental health problems" and that the Petitioner communicated and answered counsel's questions. Counsel did not file a "mitigating factors defense" and noted that the Petitioner received the minimum sentence of fifteen years. Counsel did not remember if the sentence was agreed-upon or whether there was a "sentencing by jury." Counsel agreed that he read the presentence report, including the Petitioner's self-reporting that he had bipolar disorder and had not taken medication for four months prior to the presentence report. Counsel agreed that if he had known the Petitioner had bipolar disorder, he would have requested a mental health evaluation in the trial court. Counsel reiterated that at no point in his representation of the Petitioner did he suspect that the Petitioner had mental health issues. Counsel noted that the Petitioner wrote letters to him that were "fluid, coherent, [and] well-spoken." When asked whether he was aware that the Petitioner received social security benefits as a result of being unable to work due to bipolar disorder, counsel responded that the Petitioner told him and subsequently testified at trial that he had been working up until the time of trial.

Trial counsel testified that he and the Petitioner discussed the Petitioner's right to testify, although counsel did not remember exactly when the discussion occurred. Counsel said, though, that to his recollection the trial court "went over Momon." Counsel recalled telling the Petitioner that counsel "needed to put [the Petitioner] on" as a witness so that the Petitioner could tell the jury the drugs were not his and explain why he ran from the police. Counsel stated that he had practiced law for seventeen and one-half years and that he had seen similar cases where a traffic stop for an equipment violation led to "questions about guns and drugs and eventually a search." Counsel noted that the Drug Task Force pulled over motorists for traffic or equipment violations and had "to try to get their police dog there quick so they [could] try to run the dog around while they're still ... gathering the information" in order to expose other crimes.

Trial counsel testified that during his investigation of the case, he did not find that the Petitioner's traffic stop had been delayed due to a "potential outstanding warrant issued." Counsel recalled that at trial, Officer Lovett testified that Deputy Parks arrived while Officer Lovett was still at the Petitioner's window obtaining his information and that the police dog was walked around the car while Officer Lovett waited for Spring Hill dispatch to call back his cell phone with the Petitioner's registration information. Officer Lovett further testified that the dog indicated at the second "run around" and Officer Lovett began searching the truck, where he found the green pill bottle under the front seat. The officers testified that Deputy Parks stood with the Petitioner during the search and that the Petitioner ran away; both officers pursued the Petitioner.

When asked whether it was typical to continue to search a vehicle after a traffic stop for an equipment violation and a pat-down, trial counsel responded that if the police dog indicated the presence of contraband during a sniff search, the officers had probable cause to search. Counsel stated that the Petitioner did not prolong the stop. Counsel stated that after making a motion regarding allowing questioning about the Petitioner's prior aggravated robbery conviction, the trial court allowed the prosecutor only to ask the Petitioner if he had a prior theft conviction, not robbery. Counsel raised the topic on direct examination to "un-ring the bell ... and maybe have [a] lesser effect[.]"

Trial counsel testified that both Officer Lovett and Lieutenant Doelle testified as expert witnesses. Counsel did not recall whether Officer Lovett was certified as an expert in narcotics. Counsel noted that Officer Lovett's testimony was "a lot more confusing" than that of Lieutenant Doelle. As an example, counsel noted Officer's Lovett's describing a "20-rock" first as containing one gram of cocaine, then later as containing between 0.7 and 0.9 grams of cocaine. Lieutenant Doelle testified that a 20-rock contained 0.1 grams of cocaine. Counsel surmised that the State's argument was that the Petitioner possessed "20 rocks" and noted that on cross-examination, Lieutenant Doelle admitted that a "heavy crack user" could consume three grams of cocaine in two days. When asked whether he generally would have objected to the quality of testimony Officer Lovett gave, counsel stated that after voir dire, he felt that the trial court was going to qualify Officer Lovett as an expert and that any confusion during Officer Lovett's testimony in comparison to Lieutenant Doelle's testimony served to discredit Officer Lovett.

Trial counsel testified that although he did not speak to Officer Lovett or Deputy Parks before trial, he was able to contact Lieutenant Doelle. Counsel did not remember any "major issues" when comparing Officer Lovett's and Deputy Parks's chronologies of the relevant events. Counsel recited a summary of the officers' testimony and the Petitioner's contention that he felt intimidated and targeted due to his race.

When asked whether he discussed with the Petitioner "any other cases successfully appealed regarding driving through a drug-free zone," trial counsel responded that he told the Petitioner "the status of the law was simply driving through the zone was enough" to be convicted. Counsel noted that he explained that if the jury believed the cocaine was of a sufficient amount and the Petitioner intended to sell it, the Petitioner should "look kind of hard" at the plea offer of eight years at thirty percent service. Counsel reiterated that the Petitioner did not "want anything to do with" the plea offer because he maintained that he was unaware that the cocaine was in the truck. The Petitioner did not want to serve any time in prison. Counsel stated that he "would have never told [the Petitioner] that ... he had to actually sell" cocaine inside a drug-free zone in order to be convicted.

Trial counsel agreed that in the motion for a new trial and on appeal, he argued for an interpretation of the relevant statute requiring proof of the intent to sell drugs

inside the drug-free zone. Counsel explained that he raised the issue "in hopes that maybe [this court or our supreme court would] take a second look at it and maybe change their mind about it." Counsel noted the trial court's discussion of the fact that a person who sold drugs to a child outside of a school zone faced an eight-to-twelve-year sentence, whereas a person who intended to sell drugs to an adult and was caught with the drugs in a school zone faced a fifteen-to-twenty-five-year sentence.

Trial counsel testified that he did not call character witnesses. The Petitioner testified regarding his theory that a friend to whom he had lent the truck left the cocaine there. Counsel noted that he did not expect any of the Petitioner's friends to admit ownership of the cocaine. Counsel stated that he discussed with the prosecutor the potential witnesses and that the State did not call any unanticipated witnesses at trial. Counsel said that he reviewed the preliminary hearing transcript and listened to the hearing recording. When asked whether discrepancies existed between the officers' preliminary hearing and trial testimonies, counsel stated, "There was one point, I wouldn't say it was [a] discrepancy but it ... [came] out about the State maybe wanting a *White* instruction, which I believe the [trial court] did give." Counsel noted his argument at trial that he be permitted to question Officer Lovett regarding the dismissed evading arrest charge in order to "offset" the State's emphasis on the Petitioner's fleeing from police. Counsel further noted that in order to combat the State's argument regarding the lack of drug paraphernalia in the truck, counsel emphasized that no large sums of cash or small plastic bags were found in the truck and that the truck was not seized pursuant to civil forfeiture. Trial counsel denied telling the jury that the Petitioner smoked crack cocaine, although he argued in the context of simple possession that the Petitioner could have afforded three grams of cocaine for personal use. Counsel stated that he stipulated to the elementary school's status for purposes of the drug-free zone statute. Counsel denied that there was any trial preparation he intended to do but ultimately did not do. Counsel denied that the Petitioner requested any items before trial that he failed to receive, with the exception of the subpoenaed dispatch records, which did not seem to exist.

Post-conviction counsel allowed the Petitioner to question trial counsel. Upon questioning by the Petitioner, trial counsel testified that he recalled discussing the Petitioner's driving his wife's car while his truck was being repaired by a friend. Counsel did not recall the Petitioner's hypothesizing that his wife put the cocaine in the truck or telling the Petitioner to forego mentioning his theory in front of the jury. Counsel did recall the Petitioner's arguing with his wife about "putting miles on" her car on the night of the traffic stop.

On cross-examination, trial counsel denied that he ever questioned the Petitioner's competency to stand trial or assist counsel in his defense. To prepare for trial, counsel filed a motion for discovery; discussed the case with the Petitioner and the prosecutor; researched "police dog issues" and the circumstances of the traffic stop relative to a possible suppression motion; tried to obtain the dispatch recording;

tried to negotiate a plea offer and conveyed the offer; explained to the Petitioner the benefits of the plea offer and the risk of going to trial; argued to keep out evidence of the Petitioner's prior conviction; and developed the arguments that the cocaine did not belong to the Petitioner or, alternatively, that the cocaine was for personal use. Counsel did not interview Officer Lovett and Deputy Parks because he reviewed the preliminary hearing testimony, knew what their trial testimony would be, and did not believe a suppression issue existed.

On redirect examination, trial counsel identified a letter the Petitioner sent him after trial, in which the Petitioner requested a copy of the arrest warrant affidavit and asked about the possibility of accepting the plea offer. Counsel noted that the Petitioner claimed in the letter counsel told him the State had to prove he "was making a sale in the school zone," which counsel denied. When asked whether the Petitioner was confused because there was not enough time to fully discuss the issue or the Petitioner had "comprehensive [sic] issues," counsel responded that after discussing it with the Petitioner on multiple occasions, he felt the Petitioner understood that he could be convicted for merely driving through the drug-free zone with the cocaine. Counsel again indicated his personal disagreement with the prevailing application of the law. Counsel stated that he told the Petitioner that he would argue for an alternative interpretation of the statute, although counsel did not think "that was the status of the law." Counsel further noted that in his opinion, that the manner in which the jury instruction regarding the drug-free zone enhancement was written was at odds with case law on the topic.

Upon examination by the post-conviction court, trial counsel testified that he would have explained the concept of constructive possession to the Petitioner. Counsel noted, though, that he did not know whether he "went into a specific enough conversation where [the Petitioner] understood that" concept. Counsel also discussed with the Petitioner that his flight from police was damaging to his case. The Petitioner testified that he was diagnosed with bipolar disorder in 2011 and had been prescribed lithium, klonopin, and Prozac. The Petitioner applied for and was granted social security disability benefits in spring 2011, two months after he applied. He stopped taking his medication around spring 2013 because he did not like taking medications. The Petitioner stated that trial counsel was aware of the Petitioner's receiving social security benefits as a result of his being disabled due to mental health issues. The Petitioner noted that he paid counsel on the third of each month because he received his social security check on the first of the month. The Petitioner testified that although trial counsel gave him a list of the State's evidence before trial, he never received a copy of the discovery materials. The Petitioner had never seen the "Notice of the Impeaching Conviction" before the post-conviction hearing and was not aware he would be impeached if he testified. The Petitioner stated that he met with counsel in April, May, and at court in June and July. The Petitioner estimated that he spent one and one-half hours with counsel in total outside of court. Counsel and the Petitioner reviewed the recording of the preliminary hearing in May, but the recording was indecipherable. According to the Petitioner, they agreed that they needed a transcript of the hearing.

17

The Petitioner testified that the day before trial, trial counsel called him while the Petitioner was at work and asked whether he was going to proceed to trial. Counsel asked the Petitioner to "just come in like an hour before trial." Counsel was late for their meeting and arrived fifteen minutes prior to trial. The Petitioner stated that they were late for the trial and that when the trial court asked why they were late, counsel responded that "he was telling [the Petitioner] what happened and that's why [counsel's] closing arguments were wrong about it."

The Petitioner testified that trial counsel never consulted him regarding the issues in the motion for a new trial or on direct appeal. The Petitioner stated that he "begg[ed]" for the trial transcript and that counsel was recorded in prison telephone calls saying, "[D]on't worry about that, they don't have [any] evidence against you, they have to prove you were in a school zone selling drugs[.]" The Petitioner eventually obtained the trial transcript from post-conviction counsel.

The Petitioner testified that trial counsel told him "over and over" that the State had to prove he was selling drugs in a school zone. The Petitioner thought that counsel was correct because at the motion for a new trial hearing, the trial court commented that it could not find any case similar to the Petitioner's and that "we were going to send it on to the appeal process." The Petitioner noted that ultimately, counsel's legal advice that the Petitioner had to be selling drugs in a school zone to be convicted was incorrect. The Petitioner stated that counsel also advised him on the morning of trial to plead guilty to the marijuana and traffic charges because it would make him "seem more believable to the jury." Counsel explained on the morning of trial that the Petitioner had to decide whether to testify and told him to think about it. When the trial court asked whether the Petitioner would testify, counsel said that he would. The Petitioner "felt obligated to testify once he said that in front of the jury." The Petitioner had not yet told counsel whether he wanted to testify. The Petitioner stated that in a prior telephone conversation, counsel told him his previous convictions were inadmissible because they were not drug related.

The Petitioner testified that on the night of the traffic stop, he gave consent for the officers to search his person, and nothing other than a receipt was found. He did not give consent for them to search his truck, although "they said [he] did." The Petitioner received a copy of Officer Lovett's police report before the direct appeal was filed. The Petitioner stated that the following discrepancies existed between the officers' testimony and the actual events: Officer Lovett testified that he never saw a Taser probe hit the Petitioner, but in the police report stated that "once he noticed that the ta[s]ing didn't phase [the Petitioner], then he pursued [him]"; both officers testified at the post-conviction hearing that they chased the Petitioner, but Officer Lovett testified at trial that the reason he stopped chasing the Petitioner was because he was alone and felt unsafe; the Petitioner only saw one police vehicle with two occupants and not two vehicles; and Officer Lovett testified at the post-conviction hearing that his police cruiser was not equipped with a camera, but he testified at trial that his camera was not functioning.

18

The Petitioner summarized his version of events, which was mostly consistent with his trial testimony. The Petitioner stated that Deputy Parks asked him where "the guns" were and "never said anything to [the Petitioner] about drugs." The Petitioner also stated, though, that when Deputy Parks asked about guns, the Petitioner thought he was being "profiled" and that because the Petitioner had a prior robbery conviction, Deputy Parks was "thinking there [were] drugs in [the Petitioner's] vehicle." The Petitioner said that when Deputy Parks explained that the police dog was going to be walked around his truck, he told them to "go ahead" because he had nothing to "worry about." The Petitioner noted that the marijuana cigarette in the ashtray did not contain any marijuana and that he had "bit[ten] the tip off of the cigar before [he] smoked it."

The Petitioner testified that the police dog "jumped up, sniffed through [his] vehicle" twice and did not signal, that the officer with the dog put the dog back into his police cruiser, and that the Petitioner asked one of the officers if he was racist. The Petitioner asked Deputy Parks if he could receive his citation and leave; Officer Lovett put on gloves and opened the truck's door; and Officer Lovett told the Petitioner, "I wouldn't have [done] this to you if you wouldn't have asked me if I was racist[.]" The Petitioner noted that from his vantage point at the back of the truck, he could not see where Officer Lovett was searching. The Petitioner stated that Officer Lovett told him that the Petitioner's father "yelled at [the Petitioner] as a kid and [the Petitioner] just didn't ever tell the truth." The Petitioner's reaction was to "swing at" Officer Lovett, but he did not. The Petitioner saw a camera in Officer Lovett's police cruiser, decided "to fight this in court," and "took off running." The Petitioner stated that one of the officers fired a Taser and hit the Petitioner, but he pulled out the Taser probes before he was shocked. As he continued to run, the Petitioner asked himself why he was running. Deputy Parks grabbed the Petitioner's jacket, and the Petitioner slipped out of it. Ultimately, the Petitioner circled back to his car and saw it sitting in the street with the doors open. The officers were gone. The Petitioner decided not to retrieve his truck and instead went to a friend's house. His friend's mother declined to allow him to stay there, although she believed that he did not do anything wrong.

The Petitioner did not remember "an issue with an outstanding warrant that they were trying to check[.]" He noted that he did not see the officers "doing anything." The Petitioner estimated that the traffic stop lasted "ten, 15, 20 minutes or so." The Petitioner did not check his clock when he was stopped, and he noted that his cell phone was taken by the police after he left it in the truck. The Petitioner stated that his "felony evading charge" was dismissed after one of the officers testified at a preliminary hearing that the Petitioner was "free to leave the scene." The Petitioner said that he "asked [trial counsel] about sending the scales off" to be fingerprinted. When asked whether he requested "fingerprinting DNA analysis," the Petitioner stated, "I didn't know.... I thought that was just what the police did. I didn't know that I had to make a request to have it." When asked whether there were any witnesses the Petitioner wanted counsel to speak with during trial preparation, the

Petitioner stated, "No, he didn't follow through [with] it." The Petitioner stated that he read in the trial transcript counsel's argument to the jury regarding constructive possession and that counsel "stated to the jury that you just having drugs around you is not enough to say that the drugs are yours. That's in [the] transcript and that's what [counsel] was originally telling [the Petitioner.]"

The Petitioner testified that trial counsel discussed filing a motion to suppress but ultimately did not do so based upon his legal research. The Petitioner never visited the scene of the stop with counsel and did not know if counsel visited it independently. The Petitioner stated that he started taking lithium when he went to jail and that "within the last couple of months" had stopped taking it without consulting his doctor. The Petitioner said that in his opinion, counsel's discussing the Petitioner's guilty pleas in front of the jury "plant[ed] in the jury's mind that [he] was guilty already[.]" The Petitioner stated that although he had "several issues" he wanted counsel to pursue before trial, he could not remember them. The Petitioner said that he attended two years of college.

The Petitioner testified that he did not understand Officer Lovett's "switching up his stories so many times" and that the inconsistencies "show[ed] that he [was] a liar and that he[ was] capable of lying." The Petitioner opined that trial counsel should have attacked the credibility of the police officers and that in the absence of another person claiming ownership of the drugs or an argument that the police "did anything," the jury would have "ha[d] to" conclude the drugs belonged to the Petitioner. The Petitioner stated that counsel should have spoken to the officers before trial "so he could have at least known what they were going to testify to" and see if anything could be done about the testimony. The Petitioner further stated that counsel made references to the Petitioner's smoking crack cocaine such that the Petitioner almost lied during his testimony when counsel asked if he used cocaine. The Petitioner hypothesized that if he had admitted to using cocaine, he would have been convicted of simple possession. Ultimately, the Petitioner decided to tell the truth at trial and denied using crack cocaine. The Petitioner stated that although he did not bear a grudge against counsel, he lost respect for counsel when counsel denied having told the Petitioner that he had to be selling drugs in a school zone in order to be convicted.

Post-conviction counsel argued in closing that the Petitioner's case was one of constructive possession, that no DNA or fingerprint testing tied the Petitioner to the cocaine, and that it would cost $600,00010 for the Tennessee Department of Correction to house the Petitioner during his sentence. Counsel noted that the street value of the cocaine in this case was at most $600 and that the comparative cost to the State of housing the Petitioner was not a good use of State resources. Counsel argued that the application of the drug-free zone "enhancement" to an initial offense without "an application to only subsequent charges[,]" analogizing to domestic assault and driving under the influence sentencing enhancements, was unconstitutional. The post-conviction court noted that in its opinion, the drug-free zone statute was not "logical" because it did not enhance the punishment for selling

drugs to children, but rather subjected defendants to a harsher penalty for driving through a one-thousand-foot radius from a school. The court further commented that the statute gave prosecutors "an unfair negotiating advantage in being able to almost pressure people" into accepting plea offers and that "once the Legislature put[ ] a drug crime on the book, it's not good politics to vote to take it off." The court noted that it and the jury were bound by the law "whether they like[d] it or not[.]" Post-conviction counsel also argued that the drug-free zone enhancement was contrary to the intent of the Tennessee Criminal Sentencing Reform Act of 1989 because the sentence was not "justly deserved" in relationship to the seriousness of the offense.

The post-conviction court stated that "about the only evidence that might make [trial counsel] ineffective would be if [the Petitioner] was true in saying that [counsel] told him the State could not convict him unless they proved they he was selling, or intending to sell drugs within a thousand feet of that school." The court noted that "the real credible evidence" was that counsel advised the Petitioner to accept the plea offer "because [counsel] knew that unless [the jury] believed a convicted thief, that he didn't know the drugs [were] in his truck, then the jury was going to find that his running [from police] ... was going to make this a slam-dunk case for the State[.]" The court noted that counsel's "only chance of helping" the Petitioner was to either convince him to plead guilty or to convince the jury that the cocaine was for personal use. The court noted Lieutenant Doelle's testimony that no drug paraphernalia typical of a cocaine user was found in the truck. The court noted another case over which it presided in which a defendant "fell on some" cocaine during the execution of a search warrant and in which the court did not agree with the imposition of a fifteen-year minimum sentence but was bound to do so by law.

In a written order denying post-conviction relief, the post-conviction court found, as relevant to this appeal, that the Petitioner's allegation regarding the unconstitutionality of his conviction "alleg[ed] a legal conclusion, without any specific facts[.]" The court found that trial counsel was "well aware" of the evidence against the Petitioner and conducted an adequate pretrial investigation. The court noted that the Petitioner "failed to present any evidence that could have resulted from a more thorough investigation at the evidentiary hearing." *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Relative to the Petitioner's contention that counsel should have shown "an absence of prior drug charges," the court found that such evidence "could have backfired" on the Petitioner and that it would not question counsel's strategy. Relative to the Petitioner's argument that counsel did not spend enough time communicating with him before trial, the court found that "[t]here was no particular reason to spend a lot of time on trial preparation itself" and that counsel tried to persuade the Petitioner to avoid trial. The court further found that "[a]ny fault for failure to intelligently communicate [lay] with the Petitioner, not his counsel."

Relative to Officer Lovett's being qualified as an expert, the post-conviction court found that trial counsel's cross-examination revealed "some weaknesses" in the expert's opinion and that the jury was instructed regarding credibility determinations. The court found that the Petitioner's objections to portions of Officer Lovett's testimony went to the weight rather than the admissibility of such evidence. Relative to the inconsistencies in the officers' testimony, the court found that counsel cross-examined the officers about the inconsistencies. The court found relative to sentencing that counsel was not ineffective for failing to file a notice of mitigating factors and that the Petitioner received the minimum sentence available. Relative to the Petitioner's bipolar disorder, the court found that counsel was not aware of any mental health issues until he read the presentence report, that the Petitioner communicated well and had completed more than one year of college, and that the Petitioner "showed no evidence" of mental issues during trial or the post-conviction hearing. The court further found that no evidence suggested the Petitioner's rights were violated or that his diagnosis "had any impact upon the outcome of the trial."

The post-conviction court found that although trial counsel used an incorrect date when attempting to subpoena the police dispatch records, the Petitioner failed to show how the records would have led to a different outcome at trial, and the court found that no such records existed. The court found that the Petitioner did not prove prejudice resulted from counsel's failure to interview Deputy Parks and Officer Lovett, noting that counsel had access to the written police reports and the audio recording of the preliminary hearing.

Paragraph 44 of the amended post-conviction petition stated as follows:

> Petitioner asserts that trial counsel rendered ineffective assistance of counsel by failing to have a thorough discussion with Petitioner regarding whether Petitioner should testify[,] violating Petitioner's 6th Amendment Rights. The decision to testify or to not testify is solely at the discretion of Petitioner, and this decision was based on an inadequate pretrial investigation, lack of meaningful consultation with Petitioner. and a failure to prepare thoroughly for trial, especially given the serious nature of the charges and the penalties they commanded if convicted.

The post-conviction court found relative to paragraph 44 that it "merely allege[d] a conclusion that [was] not supported by credible evidence." The court found that counsel "did a meaningful preparation" for trial, that "not much factual dispute" existed in the case, and that the failure of the defense theory to succeed did not entitle the Petitioner to relief.

Relative to the proportionality of the sentence and its being against the intent of the principles and purposes of sentencing, the court found that it agreed with the

Petitioner, but "appellate courts have denied such relief, and this [c]ourt is without authority to grant the Petitioner any relief[.]"

Relative to trial counsel's failure to file a motion to suppress, the post-conviction court found that any motion to suppress did not have a reasonable chance of success, that counsel was familiar with the relevant case law, and that according to the officers' testimony, the police dog sniff search did not prolong the stop. Relative to trial counsel's failure to request DNA or fingerprint testing, the court found that although such evidence could have weighed in favor of the Petitioner, his flight from police was "strong circumstantial evidence of guilty knowledge and might have resulted in his conviction" even if the Petitioner's DNA and fingerprints were not present on the drugs or scales. The court found that the Petitioner's allegation that counsel fell below professional standards in investigating and evaluating the case was a "mere conclusion not supported by the evidence." The court concluded that the Petitioner had not shown that counsel rendered ineffective assistance. The court noted that it did not "like" the result of the case and found that the result was not counsel's fault. The court found that counsel "went above and beyond the call of duty in trying to get [the Petitioner] to understand the substantial risk of his unwillingness to assume any responsibility for those drugs found in his truck after he fled the scene on foot." The court articulated its belief that the Petitioner's only avenue for relief was through a commutation of his sentence "to something more appropriate for the crime." This timely appeal followed.

*Jones v. State*, No. M2018-00711-CCA-R3-PC, 2020 WL 528029, at *3-13 (Tenn. Crim. App. Feb. 3, 2020).

## III.  STANDARD OF REVIEW

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id*.

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct, and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). State-court factual findings are "only unreasonable where they are 'rebutted by clear and convincing evidence' and do not have support in the record." *Moritz v. Woo*ds, 692 F. App'x 249, 254 (6th Cir. 2017) (quoting *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (internal quotation marks omitted)). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). Review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29

(2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted); *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) (the substance of the claim must have been presented as a federal constitutional claim). This rule has been interpreted by the Supreme Court as one of total exhaustion. *Rose v. Lundy*, 455 U.S. 509, 522 (1982). Thus, each and every claim set forth in the federal habeas corpus petition must have been presented to the state appellate court. *See Picard v. Connor*, 404 U.S. 270, 275 (1971); *see also Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (exhaustion "generally entails fairly presenting the legal and factual substance of every claim to all levels of state court review").

Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002). Procedural default also occurs where the state court "actually . . . relie[s] on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[ ] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman*, 501 U.S. at 729.

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman v. Thompson*, 501 U.S. 722, 754  (1991)). A petitioner may establish cause by "show[ing] that some objective factor external to the defense impeded counsel's efforts to comply

with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id*. Constitutionally ineffective assistance of trial or appellate counsel may constitute cause. *Murray*, 477 U.S. at 488-89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id*. If the ineffective assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452-53 (2000).

Petitioners in Tennessee also can establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 5-6 (2012) (creating an exception to *Coleman* where state law prohibits ineffective assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make meaningful opportunity to raise ineffective assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee). The Supreme Court's creation in *Martinez* of a narrow exception to the procedural default bar stemmed from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 566 U.S. at 13. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during

the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id*. at 13-15. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his <u>actual</u> and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court also has recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392 (2004) (citing *Murray*, 477 U.S. at 496).

### IV. ANALYSIS

With these principles in mind, the Court will turn to the examination of the claims raised Jones's petition for habeas relief. Because Petitioner repeats some claims in multiple grounds, the Court organizes its analysis by claim.

### A. Ground Two: Impartial Jury Claim

Petitioner alleges that he "was denied [his] right to an impartial jury." (Doc. No. 6 at PageID# 51).

Petitioner did not raise this claim on direct appeal to the first court of competent jurisdiction. Because he has never fully and fairly presented this claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted (since there is no "available" state remedy) but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. He therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged impartial jury.

The Supreme Court has observed that "[a] citizen's right to a jury trial guarantees that a criminal defendant will receive a fair trial by a panel of impartial jurors." *Hammer v. Bowlen*, 934 F. Supp. 911, 916 (M.D. Tenn. 1996) (citing *Irvin v. Dowd*, 366 U.S. 717, 721-24 (1961)). "The petitioner bears the burden of showing that a juror was unable to set aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court." *Hammer*, 934 F. Supp. at 916 (citing *Irvin*, 366 U.S. at 723-24).

Here, Petitioner bases his impartial jury claim on a quick exchange between a juror and the trial court about the juror obtaining "a work slip" and the trial court's instruction to "[c]all back this weekend about when we might need [the juror] next" as evidence of the juror being in personal contact with the trial court, thus "fix[ing]" Petitioner's trial. (Doc. No. 6 at Page ID# 5). First, the "work slip" exchange does not show that the juror was partial or the trial court acted improperly. Tennessee law provides for a "person[] paying jurors their fee or compensation for jury service . . . [to] provide a juror with a statement showing the number of hours the juror spent serving each day if the juror or juror's employer requests such a statement prior to the service at issue." Tenn. Code Ann. § 22-4-106(c). Second, Petitioner's accusation concerning the trial court's comment to the juror to "[c]all back this weekend" for potential future service likewise shows no improper

conduct. Petitioner simply makes a conclusory allegation that the juror and the trial court were "in personal contact" with each other because, according to Petitioner, the courthouse is closed on the weekend. (Doc. No. 6 at Page ID# 51). Petitioner provides no evidence demonstrating that the juror was not able to "render a verdict based solely upon the evidence presented in court" beyond his own self-serving, conclusory assertion. And conclusory allegations lacking evidentiary support provide no habeas corpus relief. *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003). Furthermore, it is the practice of many trial courts for potential jurors to phone the court over the weekend for the purpose of receiving recorded instructions. Thus, Petitioner has not shown that "the trial was infected with constitutional error." *United States v. Frady*, 456 U.S. 152, 170-72 (1982).

Petitioner's impartial juror claim is procedurally defaulted and Petitioner has not excused the default by showing that he suffered actual prejudice. *See United States v. Frady,* 456 U.S. 152, 170-72 (1982). Neither has Petitioner alleged actual innocence. This claim will be dismissed.

### B. Grounds Two and Three: Due Process Claims

Petitioner alleges that his "due process was violated." (Doc. No. 6 at PageID# 52).

Petitioner did not raise this claim on direct appeal to the first court of competent jurisdiction. Because he has never fully and fairly presented this claim to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. Petitioner therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged due process violations.

Petitioner alleges that his due process rights were violated in a number of ways. First, in Ground Two he alleges that Assistant Attorney General Black read an "unsigned indictment" that was never presented to the jury which, according to Petitioner, shows that the indictment was prepared prior to him allegedly committing the crime and supports Petitioner's assertion that his trial was fixed. However, the record shows that the grand jury returned a true bill of indictment charging Petitioner with the offense of which he was later convicted at trial. (Doc. No. 15, Attach. 1 at Page ID# 117-19). Therefore, Petitioner was properly indicted and had constitutionally sufficient notice of the charge upon which he proceeded to trial. *See generally* Tenn. R. Crim. P. 6(e) ("Duties of the Grand Jury"), 6(h) ("Duties of District Attorney General"). Since Petitioner's allegation is refuted by the record, this claim provides no relief.

Petitioner also asserts in Ground 2 that his due process rights were violated because the trial court forced Petitioner to plead guilty in front of the jurors before the reading of the indictment "in violation of suggestive procedures." (Doc. No. 6 at Page ID# 51). However, the trial transcript shows no such occurrence. (*See* Doc. No. 15, Attach. 3 at Page ID# 198-99). The trial court only asked whether Petitioner would testify (1) after counsel, during opening statements, repeatedly told the jury that Petitioner would be testifying and (2) after the trial court had dismissed the jury for the day. (*See* Doc. No. 15, Attach. 3 at PageID# 212; Doc. No. 15, Attach. 4 at PageID# 368). Furthermore, the record reflects that trial counsel advised Petitioner to plead guilty to the two lesser charges in front of the jury before proceeding to trial on the most serious offense to gain credibility with the jury. *See Jones*, 2020 WL 528029, at *16. Petitioner accepted this advice. *See id.* Thus, the record shows that this decision did not involve any coercion by the trial court. The claim provides no basis for relief.

Petitioner next alleges in Ground 2 that the trial court's statement concerning "legitimate jury questions about the DFZ [drug-free zone issue]" violated Petitioner's due process rights because the statement showed that "the State didn't prove [Petitioner] was in the DFZ w/ the intent of selling anything." (Doc. No. 6 at Page ID# 51). However, the record shows that the trial court made this statement when denying Petitioner's motion for judgment of acquittal, thus deciding that the State presented sufficient evidence to sustain a conviction if the jury decided that the State proved its case beyond a reasonable doubt. (*See* Doc. No. 15, Attach. 5 at Page ID# 454-56); *see* Tenn. R. Crim. P. 29(b). If Petitioner's misunderstanding of the record was accurate, the trial court would have entered a judgment of acquittal at that time rather than proceeding with the trial. *See* Tenn. R. Crim. P. 29(b). Thus, this claim fails.

Finally, Petitioner alleges in Ground 2 that his due process rights were violated because Judges Jones and Holloway have a "close" relationship "outside of work" which contributed to delays in Petitioner's case and intentional omissions of issues raised by Petitioner. (Doc. No. 6 at Page ID# 51-52). However, without more, the fact that two judges may be friendly does not establish that the courts were not neutral and free from judicial bias. Additionally, Petitioner does not identify any "issues that were in [his] original petition" that were allegedly "left out[.]" (Doc. No. 6 at Page ID# 51-52). Petitioner's conclusory allegation of judicial bias therefore fails.

In Ground 3, Petitioner alleges a due process violation based on the trial court's instructing the jury on "flight" from arrest. Petitioner states that he was acquitted of "evading arrest" when the charge was dismissed before his indictment; therefore, according to Petitioner, his due process rights were violated when this dismissed charge was used as "probable cause to send the case to" the jury. (Doc. No. 6 at PageID# 52). Some context is necessary to understanding Petitioner's claim. During Petitioner's trial, the State requested that the court instruct the jury on "flight." (Doc.

No. 15, Attach. 3 at PageID# 341). This request generated much discussion between the parties and the trial court. Defense counsel argued that, if the court provided the flight instruction, the jury should hear evidence that Petitioner "was charged originally" with evading arrest before the charge was "dismissed" when the "officer did not present it or go forward on it with the grand jury and try to bring it onto this [trial court]." (*Id*. at PageID# 341-42). During closing argument, defense counsel told the jury that a flight instruction "tells you that you can draw an inference" of a "consciousness of guilty" from a defendant's flight. (Doc. No. 15, Attach. 6 at PageID# 556-57). Defense counsel argued, however, that "an entirely innocent person may take flight and such flight may be explained by proof offered or by the facts and circumstances of the case" and that the jury must consider the flight "in the light of the evidence of whether or not [the State has] proven every element of this crime that [the State] alleged here." (*Id*. at Page ID# 557). After closing arguments, the trial court provided the pattern jury instruction on flight. (*Id*. at PageID# 532).

First, this claim is based on Petitioner's misunderstanding that he was acquitted of evading arrest. (*See* Doc. No. 6 at PageID# 52). Petitioner was not acquitted. Defense counsel stated that the charge was "dismissed," and the prosecutor acknowledged that there were "any number of reasons that [charge] could have been dismissed at the sessions stage or prior to circuit court, and that is not an adjudication on the merits." (Doc. No. 15, Attach. 3 at Page ID# 342). Thus, Petitioner's argument fails at the start because the record shows he was not acquitted of evading arrest.

In any event, to obtain habeas relief based upon a jury-instruction issue, Petitioner must establish that the flight instruction "violated some right guaranteed [him] by the Fourteenth Amendment or infected the entire trial to the extent that the resulting conviction violates due process." *Drain v. Woods*, 902 F. Supp.2d 1006, 1030 (E.D. Mich. 2012) (citing *Cupp v. Naughten*,

414 U.S. 141, 146-47 (1973)); *see also Murr v. United States*, 200 F.3d 895, 906 (6th Cir. 2000) ("Petitioner must show that the instructions, as a whole, were so infirm that they rendered the entire trial fundamentally unfair.").

In Tennessee, the trial court may instruct the jury on flight "as an inference of guilt" if there is "sufficient evidence to support such instruction." *State v. Martinez*, No. W2019-02033-CCA-R3-CD, 2021 WL 2949514, at *18 (Tenn. Crim. App. July 14, 2021) (quoting *State v. Barry*, 141 S.W.3d 549, 588 (Tenn. 2004)). Sufficient evidence supporting a flight instruction exists where there is evidence of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving of the community for parts unknown." *State v. Burns*, 979 S.W.2d 276, 289-90 (Tenn. 1998) (citation and internal quotation marks omitted). The State may satisfy the "subsequent hiding out, evasion, or concealment" requirement by presenting proof from which a jury might infer that the defendant committed such acts. *Rogers v. State*, 455 S.W.2d 182, 186-87 (Tenn. Crim. App. 1970). A defendant's brief evasion of authorities is sufficient to support the giving of an instruction on flight. *Payton*, 782 S.W.2d at 498. "Evidence of flight to avoid arrest may be rebutted by a credible explanation of some motive other than guilt, but the conclusion to be drawn from such evidence is for the jury upon proper instructions from the trial court." *Hall v. State*, 584 S.W.2d 819, 821 (Tenn. Crim. App. 1979).

At trial, Petitioner never contested his flight from the officers; he contested his reason for fleeing and attempted to provide a "credible explanation of some motive other than guilt" for his flight. *See Jones*, 2017 WL 2493684, at *5. The record shows that the trial court used the pattern jury instruction on "flight", specifically Tennessee Pattern Jury Instruction Crim. 42.18. (*See* Doc. No. 15, Attach. 1 at Page ID# 130-31; Doc. No. 15, Attach. 5 at Page ID# 456). This pattern jury instruction "has been cited with approval" by the state courts. *Martinez*, 2021 WL 2949514, at *18

(citing *State v. Kendricks*, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996)). Since Petitioner's flight from the scene was uncontested and the trial court provided a flight instruction that accurately reflected the Tennessee law described above, Petitioner cannot establish that the trial court's instruction was so infirm as to infect the entire trial with fundamental unfairness. *See Murr*, 200 F.3d at 906. Therefore, this claim, like Petitioner's other due process claims, fails.

In summary, Petitioner's due process claims are procedurally defaulted and Petitioner has not excused the default by showing that he suffered prejudice. Neither has Petitioner alleged actual innocence. The due process claims, therefore, are without merit and fail as a matter of law.

### C. Ground Four: Notice of Prior Convictions

Petitioner alleges that his constitutional rights were violated because he was not provided notice that the State planned to use his prior convictions against him during his trial. (Doc. No. 6 at PageID# 52).

Petitioner did not raise this claim on direct appeal to the TCCA, the first court of competent jurisdiction. (*See* Doc. No. 15, Attach. 7 at PageID# 584-611). By failing to present the federal constitutional claim alleged in the instant petition to the state courts, Petitioner procedurally defaulted the claim. Therefore, he has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged error.

This claim is based on Tennessee evidentiary law. *See* Tenn. R. Evid. 609(a)(3). A claim based on real or perceived errors of state law is not cognizable in a federal habeas petition. *See* 28 U.S.C. § 2254(a) (a federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States"); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to

reexamine state-court determinations on state-law questions"); *Pulley v. Harris*, 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). Simply put, this Court cannot consider whether a claim based on Tennessee evidentiary law in violation of Tennessee law. *See Smith v. Parker*, No. 10-1158-JDB-egb, 2013 WL 5409783, at *30 (W.D. Tenn. Sept. 25, 2013) (dismissing as procedurally defaulted the petitioner's federal habeas claim that Tennessee courts misapplied state law in sentencing him where petitioner couched his claim to the state courts as arising under state law only).

In any event, the record reflects that the defense received pretrial notice of the State's intent to impeach Petitioner with his prior convictions if he decided to testify at trial. (Doc. No. 15, Attach. 1 at Page ID# 120-21). Petitioner was present when the trial court made its decision on the State's request. (Doc. No. 15, Attach. 4 at Page ID# 368). Petitioner and trial counsel did not contest the State's request based on lack of notice. (*See id.* at Page ID# 368-72). Furthermore, Petitioner does not argue how trial counsel could have prevented the use of Petitioner's prior convictions under Rule 609. Based on the record, the trial court made appropriate determinations under the plain language of Rule 609(a)(2) and (3) to permit the conviction's use. Notably, the trial court narrowed the scope of the State's use of the impeaching conviction, determining that only the "theft" element of Petitioner's robbery conviction could be used at trial. (*Id*. at Page ID# 370-72).

In sum, Petitioner has not established that the alleged lack of notice regarding the use of his prior convictions caused his trial to be infected with constitutional error to establish prejudice to excuse this default. *Frady*, 456 U.S. at 170-72. Petitioner also has not alleged that he is actually innocent. Therefore, Petitioner is not entitled to relief on this claim. The claim will be dismissed.

### D. Ground Four: Right to Testify

Petitioner alleges that his constitutional rights were violated when the trial court asked him in front of the jurors if Petitioner would testify and Petitioner "was never given a chance to answer" because his attorney answered "without [Petitioner] having any input." (Doc. No. 6 at PageID# 52).[1]

Petitioner did not raise this claim on direct appeal to the TCCA, the first court of competent jurisdiction. (*See* Doc. No. 15, Attach. 7 at PageID# 584-611). By failing to present the federal constitutional claim alleged in the instant petition to the state courts, Petitioner procedurally defaulted the claim. Thus, he has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged error.

Here, the record belies Petitioner's assertion that trial counsel "answered [without Petitioner's] input" regarding whether Petitioner would testify. During defense's opening statement, counsel told the jury and trial court that Petitioner would testify. (*See* Doc. No. 15, Attach. 3 at PageID# 210-12). During Petitioner's post-conviction hearing, trial counsel testified that he and Petitioner discussed Petitioner's right to testify and "went over *Momon*",[2] although counsel did not remember exactly when the discussion occurred. *Jones*, 2020 WL 528029, at *6. Counsel testified that he recalled telling Petitioner that he "needed to put [the Petitioner] on" the stand so he "could tell the jury the drugs were not his and explain why he ran from the police." *Id*.

Regarding Petitioner's assertion about the trial court, the record shows that the trial court only asked whether Petitioner would testify after counsel repeatedly told the jury during opening

---

[1] The Court addresses Petitioner's claim that this allegation establishes a basis for ineffective assistance of counsel *infra* along with Petitioner's other ineffective assistance of counsel claims.

[2] In *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999), the Tennessee Supreme Court outlined a prophylactic procedure designed to ensure that a defendant's waiver of his right to testify is voluntary, knowing, and intelligent and that a defendant understands that he or she has a right to testify.

statements that Petitioner would be testifying and again after the trial court had dismissed the jury for the day. (*See* Doc. No. 15, Attach. 3 at PageID# 212; Doc. No. 15, Attach. 4 at PageID# 368).

Petitioner cannot excuse his default of this claim because it lacks merit, and Petitioner does not allege actual innocence. Therefore, Petitioner is not entitled to relief on this claim. The claim will be dismissed.

### E.  Ineffective Assistance of Counsel

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.  To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v.  Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000). In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

37

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland*, 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law; or that it "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1),(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, such as here, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). As the Supreme Court clarified in *Harrington*:

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a

deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted).

The Court will begin by analyzing Petitioner's ineffective assistance claims that Respondent concedes are properly exhausted. (*See* Doc. No. 16 at PageID# 1216).

    1. <u>Ground One - Trial Counsel's Alleged Failure to Investigate the Facts Surrounding the K-9</u>

Petitioner first alleges that trial counsel was ineffective by failing to investigate "the facts surrounding the K-9 'Abby.'"[3] (Doc. No. 6 at PageID #50). Petitioner contends that Officer Lovett lied about the dog he used to alert during Petitioner's 2014 traffic stop and about the date on which he began working with the Spring Hill Police Department. (*Id.*) According to Petitioner, if trial counsel had investigated the K-9 facts, he could have established Officer Lovett's perjury and the court would have granted Petitioner's motion to suppress, causing the jury not to convict Petitioner. (*Id.*) In Petitioner's words, "I was unable to show the jury that he [Officer Lovett] was lying about the dog he used and establish the reason the dog acted as it wasn't responding to him, and that he is clearly a liar."

Petitioner did not raise this claim in his petition for post-conviction relief. (*See* Doc. No. 15, Attachs. 7 and 17). Because he has never fully and fairly presented Ground One to the state courts, and a state procedural rule prohibits the state court from extending further consideration to the claim, the claim is deemed exhausted but procedurally defaulted from federal habeas review. *See Coleman*, 501 U.S. at 752-53. Thus, federal habeas review of the claim is barred unless Petitioner can demonstrate that cause and prejudice will excuse the procedural default or that

---

[3] Petitioner spells the K-9's name as "Abby," and the Tennessee Court of Criminal Appeals spelled it as "Abbi." The Court will use Petitioner's spelling.

failure to consider the claim will result in a fundamental miscarriage of justice. *See Harris*, 489 U.S. at 262; *Coe,* 161 F.3d at 329-30.

Petitioner acknowledges his default of this claim. (*See* Doc. No. 6 at PageID# 4-5). Construing the pro se petition liberally, Petitioner argues that the ineffectiveness of his post-conviction counsel excuses the default. (*Id*. at Page ID#5). Indeed, "[i]nadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Martinez*, 566 U.S. at 9.

The Sixth Circuit has directed a district court considering ineffective assistance of counsel claims under *Martinez* and *Trevino* to first address whether the petitioner can demonstrate "(1) the absence or ineffective assistance of his post-conviction counsel and (2) the 'substantial' nature of his underlying [ineffective assistance of trial counsel claims]." *Woolbright v. Crews*, 791 F.3d 628, 637 (6th Cir. 2015). If the petitioner demonstrates these first two elements, the petitioner has established cause to excuse the procedural default, and the district court must then determine whether the petitioner can establish prejudice from the alleged ineffective assistance of trial counsel. *See id*. If the petitioner successfully establishes cause and prejudice, the final step is for the district court to evaluate the underlying ineffective assistance of trial counsel claims on the merits. *See Atkins v. Holloway*, 792 F.3d 654, 659–60 (6th Cir. 2015).

In demonstrating a substantial claim of ineffective assistance of trial counsel, the petitioner must prove prejudice under *Strickland*. *See McGuire v. Warden, Chillicothe Corr. Inst*., 738 F.3d 741, 752 (6th Cir. 2013) ("To be successful under *Trevino*, [a petitioner] must show a 'substantial' claim of ineffective assistance, and this requirement applies as well to the prejudice portion of the ineffective assistance claim." (internal citations omitted)). Under *Strickland*, a petitioner can prove prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. 668, 694. As one court explains:

> The "actual prejudice" requirement of *Coleman* and the prejudice requirement of *Strickland* overlap such that in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

*Thorne v. Holloway*, No. 3:14-cv-0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014). The Supreme Court has defined this "substantial" showing as requiring a petitioner to show that the claim has some merit. *Martinez*, 566 U.S. at 14 (citing *Miller-El v. Cockrell*, 537 U.S. 322, (2003)). The threshold inquiry "does not require full consideration of the factual or legal basis supporting the claims." *Miller-El*, 537 U.S. at 336, 338.

*Martinez*, however, does not provide relief here because the defaulted claim is not substantial; it does not have merit. 566 U.S. at 14. According to Petitioner, had counsel investigated the K-9 facts, counsel would have been able to show that Officer Lovett was lying about which dog he used during Petitioner's traffic stop. However, the record belies Petitioner's assertion. During Petitioner's trial, counsel asked Officer Lovett a series of questions about the dog Officer Parks brought to Petitioner's traffic stop. (Doc. No. 15, Attach. 3 at PageId# 77-78). The State objected to this line of questioning on relevance grounds, stating, "I mean that dog is not involved in any way shape or form." (*Id*. at PageID# 78). Defense counsel responded, "That's what the State says. I think some later testimony as to the dog and stuff that was used might be an issue." (*Id*.) The Court overruled the State's objection, permitting defense counsel to continue exploring the issue of which dog was used during Petitioner's traffic stop. (*Id*. at 78-79). During counsel's

extensive questioning of Officer Lovett, the officer explained the process of his dog Abby scanning Petitioner's vehicle which involves multiple passes. His testimony was that the dog did not fail to respond but instead performed as trained and alerted that it had detected an airborne narcotic odor. (*Id*. at PageID# 95-101). On cross examination of Officer Parks, counsel asked about whose decision it was to use the K-9, whose dog was used, and what, if anything, Officer Parks observed during Officer Lovett's scan of Petitioner's vehicle with the K-9 Abby. (Doc. No. 15, Attach. 5 at PageID#408-411). Counsel also asked defendant questions about the dog scan. Petitioner testified that Officer Lovett conducted the search and Petitioner believes the dog did not alert. Counsel did not make any argument about dogs during his closing argument. Thus, the record shows that counsel vigorously pursued questioning about the dogs. Petitioner has failed to show that counsel's performance related to the K-9 questioning was deficient.

Petitioner also alleges that Officer Lovett lied about the dates of his employment with the Spring Hill Police Department and that, if counsel had explored this lie, counsel could have shown that Lovett perjured himself, which in turn would have led to the granting of Petitioner's suppression motion which is turn would have led to no conviction. Again, the proof belies Petitioner's assertion. During Petitioner's post-conviction hearing, Officer Parks testified that, at the time of Petitioner's traffic stop, Officer Lovett "had some type of concurrent jurisdiction where he worked for Spring Hill and was also a member of the Drug Task Force." (Doc. No. 15, Attach. 15 at PageID# 808). When counsel asked Officer Lovett if he had previously testified that he no longer worked at the Spring Hill Police Department, Officer Lovett responded: "I don't know why I would have. I've been there since 2011." (*Id*. at PageID# 818). Officer Lovett further testified that, prior to 2011, he was with the Columbia Police Department beginning in 2001. (*Id*. at PageID# 818-819). On cross examination, Officer Lovett reiterated that he "can actually go prove

42

that [he has] been with the Spring Hill Police Department since 2011 July." (*Id*. at PageID# 829).

Officer Lovett further explained that he left the Spring Hill Police Department to work for the

Maury County Drug Task Force but he was still employed through the Spring Hill Police

Department. (*Id*. at PageID# 831). Although the Spring Hill Police Department provides his

checks, he "was assigned to Maury County Drug Task Force and Maury County Sheriff's

Department badge in a Maury Co." (*Id*.) Counsel clearly questioned both officers in an attempt to

show that Officer Lovett had lied. Therefore, Petitioner cannot show that trial counsel's

performance was deficient in failing to pursue this line of questioning. Moreover, at Petitioner's

post-conviction hearing, his attorney said he decided not to file a motion to suppress because he

did not believe Petitioner had been unlawfully detained past the time that it would have been

necessary to write a citation. (*Id.* at PageID# 846).

Even assuming *arguendo* that counsel performed deficiently, Petitioner has not established

that he was prejudiced by the purported failures of trial counsel surrounding the K-9 and its

handler. *See Coleman*, 501 U.S. at 750. Petitioner does not explain why his motion to suppress

would have been granted had counsel established that Officer Lovett lied about which dog he used

or the date on which he began his career with the Spring Hill Police Department.

In short, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default

of Ground One, and Petitioner does not allege actual innocence. The claim is without merit and

will be dismissed.

## 2. Ground Five: Trial Counsel's Failure to Investigate

According to Petitioner, trial counsel provided ineffective assistance in his investigation of

the case, specifically by failing to obtain a trial transcript before proceeding on Petitioner's motion

for a new trial, failing to "research or interview anyone", failing to investigate the scene, failing to obtain a witness list or any discovery, and telling known lies. (Doc. No. 6 at PageID# 53-54).

Petitioner argued these same points and others in his post-conviction petition. In particular, Petitioner argued that trial counsel provided ineffective assistance "in his investigation of the case, arguing that counsel failed to investigate 'a number of pieces of evidence,' including visiting the site of the traffic stop, requesting DNA and fingerprint testing, obtaining a witness list . . . check[ing] and review[ing] known facts," discovering that Petitioner was receiving Social Security benefits, interviewing the State's witnesses, or providing discovery materials or a copy of the preliminary hearing transcript to Petitioner. *Jones*, 2020 WL 528029, at *14-15. The post-conviction court denied relief, finding that "trial counsel was well aware of the evidence against the Petitioner and conducted an adequate pretrial investigation" and noting that Petitioner "had failed to present any evidence that could have resulted from a more thorough investigation at the evidentiary hearing." *Id*. at *11.

In reviewing the post-conviction court's denial of Petitioner's ineffective assistance claim based on counsel's failure to investigate, the TCCA began by setting forth the governing legal standard for claims of ineffective assistance of counsel. *See id*. at *13. Applying *Strickland* and its progeny, the TCCA agreed with the post-conviction court that trial counsel's performance was not deficient or prejudicial. *Id*. at *14-15. The TCCA addressed each allegation of ineffective assistance one by one.

First, as to Petitioner's claim that counsel should have visited the scene of the traffic stop, the TCCA noted that Petitioner did not explain what more counsel should have done to yield different information or what that information might have been.

Second, as to Petitioner's claim that counsel failed to measure the distance between the traffic stop and the elementary school, the TCCA noted that Petitioner did not argue that Lieutenant Doelle's measurements were inaccurate or provide contradictory measurements.

Third, the TCCA found that Petitioner did not explain why obtaining a written witness list was necessary in light of counsel's verbal discussion of the four anticipated witnesses with the prosecutor, especially considering that no witnesses testified at trial.

Fourth, the TCCA noted that Petitioner did not argue how any delay in his obtaining a copy of the discovery file, as opposed to a list of the State's evidence, resulted in prejudice to his case.

Fifth, the TCCA found that Petitioner's statement that his having the preliminary hearing transcript would have "help[ed] illustrate discrepancies in the officer[s'] stories ... and the differences between the [p]reliminary [h]earing and trial" did not allege how this would have led to a different outcome at trial.

Sixth, as to DNA or fingerprint testing, the TCCA found that counsel had a valid tactical reason not to order testing in that the results could have possibly inculpated Petitioner and strengthened the State's case. In addition, Petitioner did not present the results of any such testing at the post-conviction hearing.

Seventh, as to interviewing the State's witnesses, the TCCA noted that Petitioner's assertion that counsel did not interview any of the State's witnesses is incorrect. Moreover, the TCCA found that Petitioner had not presented what evidence counsel would have discovered if he had conducted a more thorough investigation.

Eighth, as to the typographical error in the police dispatch record subpoena, the TCCA found that Petitioner did not admit into evidence any police dispatch records that would have been obtained if counsel had used the correct date.

Ninth, as to Petitioner's argument that presenting evidence of his bipolar disorder diagnosis and failure to take his medication would have explained to the jury the "bizarre" behavior he exhibited at the traffic stop, including accusing the police of racism and fleeing from them, the TCCA noted that Petitioner made this argument for the first time on appeal. The TCCA differentiated Petitioner's argument in his post-conviction petition and at the hearing that dealt with counsel's alleged failure to file a motion for a mental evaluation in the context of the Petitioner's competency from his failure to discover that the Petitioner was receiving Social Security benefits. The TCCA found:

> Although the Petitioner testified that he had a bipolar disorder diagnosis, as corroborated by his self-reported diagnosis in the presentence report, he did not exhibit any unusual behaviors or an inability to communicate with counsel such that counsel should have been alerted to a possible mental health issue. The Petitioner was able to discuss his case with counsel over the telephone and by letter, and counsel was unaware of the Petitioner's diagnosis until he read the presentence report. We note that the Petitioner did not "present the testimony of an expert at the evidentiary hearing to explain what, if any, mental health evidence trial counsel should have advanced" to establish his being incompetent to stand trial. *Demario Johnson v. State*, No. W2011-02123-CCA-R3-PC, 2013 WL 772795, at *8 (Tenn. Crim. App. Feb. 27, 2013); *see Black*, 794 S.W.2d at 757.

*Jones*, 2020 WL 528029, at *15.

Tenth, as to Petitioner's receiving Social Security disability benefits, the TCCA noted that Petitioner testified about his employment at trial and the post-conviction hearing; counsel also testified that the Petitioner discussed his work, and the presentence report reflects that Petitioner reported having worked multiple jobs during the period after which he was declared disabled. The TCCA explained that, "[a]lthough under some circumstances recipients of Social Security Disability benefits may work a very limited amount, generally speaking, presenting evidence of the Petitioner's receiving federal disability benefits while continuing to work could have damaged his credibility with the jury. *Id*.

These findings by the TCCA were not unreasonable. Although trial counsel does not have an absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

A reasonable investigation does not require counsel to "leave no stone unturned." *Perry Anthony Cribbs v. State*, No. W2006-01381-CCA-R3-PD, 2009 WL 1905454, at *49 (Tenn. Crim. App. July 1, 2009). Rather, "[r]easonableness should be guided by the circumstances of the case, including information provided by the defendant, conversations with the defendant, and consideration of readily available resources." *Id*. The United States Supreme Court has said, "[I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions." *Strickland*, 466 U.S. at 691.

As to Petitioner's claim that counsel should have visited the scene of the traffic stop, the TCCA credited counsel's testimony that he was "familiar with the area, he drove through the location of the stop and the route the Petitioner ran from police." *Jones*, 2020 WL 528029, at *14. Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). Further, Petitioner did not explain what more counsel should

have done to yield different information or what that information might have been. *See Kelley v. United States*, No. 1:13-cv-70, 1:08-cr-51, 2014 WL 2921821, at *14 (E.D. Tenn. June 27, 2014) (holding that petitioner's unsupported claims of what counsel failed to do, without any evidence of what a more thorough investigation would have revealed, was insufficient to demonstrate by a preponderance of the evidence that counsel performed deficiently; moreover, even assuming that counsel performed deficiently, petitioner failed to establish a reasonable probability, that had counsel conducted a more extension investigation, the outcome of Petitioner's case would have been different). The Sixth Circuit has instructed that when "one is left with pure speculation on whether the outcome of [the criminal proceeding] could have been any different, [there is] an insufficient basis for a successful claim of prejudice." *Baze v. Parker*, 371, F.3d 310, 322 (6th Cir.2004), *cert. denied*, 544 U.S. 931 (2005).

Second, as to Petitioner's claim that counsel failed to measure the distance between the traffic stop and the elementary school, Petitioner did not argue that Lieutenant Doelle's measurements were inaccurate or provide contradictory measurements. Petitioner offered no evidence in the post-conviction hearing to indicate that the trial evidence of measurement was anything other than correct and, since Petitioner had failed to present any measurement evidence at his evidentiary hearing, Petitioner failed to show how to the outcome of his criminal proceeding could have been any different in this respect. Given the record and Petitioner's continued failure to demonstrate that the trial evidence of measurement was incorrect, the state appellate court's adjudication of this issue was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the record before the state court. Petitioner has not established that trial counsel's failure to independently

measure the distance between the Fleming residence and the park and school was constitutionally deficient.

Third, as to Petitioner's claims that counsel failed to obtain a written witness list and discovery file, Petitioner did not explain why obtaining a written witness list was necessary in light of counsel's verbal discussion of the four anticipated witnesses with the prosecutor. Likewise, Petitioner did not explain how any delay in obtaining a copy of his discovery file resulted in prejudice to his case.

Fourth, as to Petitioner's claim that counsel failed to obtain the trial transcript before filing a motion for a new trial, Petitioner did not allege how this would have led to a different outcome at trial.

Fifth, as to Petitioner' claim that counsel failed to research or interview certain officers, counsel testified that he did not interview Officer Lovett or Deputy Parks because he had their written police reports and preliminary hearing testimony and already knew the substance of their proposed trial testimonies. Furthermore, as the TCCA pointed out, Petitioner is mistaken when he alleges that counsel did not interview any of the State's witnesses. Counsel testified that he interviewed Lieutenant Doelle before trial. Moreover, Petitioner failed to present what evidence counsel would have discovered if he had conducted a more thorough investigation. A petitioner's failure to present evidence that a witness's "testimony" or that certain evidence "would have benefitted" him is "fatal to any attempt to establish that 'but for counsel's alleged deficiencies,' the results of the proceedings would have been different[.]" *Moreland v. Bradshaw*, 635 F. Supp. 2d 680, 712 (S.D. Ohio 2009); *see also Stevenson v. Perry*, No. 1:16-cv-1052, 2018 WL 6186808, at *12 (W.D. Tenn. Nov. 27, 2018) (citing *Moreland* for the same principle).

Consequently, the Court finds that Petitioner has not shown that he is entitled to relief on this claim because the appellate court's determination was not contrary to *Strickland*. Neither was the appellate court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable applicable of *Strickland's* standards to those facts. Further, the state court's determinations are entitled to a presumption of correctness in the absence of clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1), which Petitioner has not submitted. This claim is without merit and will be dismissed.

### 3. Ground Four – Trial Counsel's Statement to Jury that Defendant Would Testify

In Ground Four, Petitioner alleges that trial counsel provided constitutionally ineffective assistance because he stated that Petitioner was going to testify for the defense without allowing Petitioner any input on this decision. (Doc. No. 6 at PageID# 53).

The constitutional right of a defendant to testify at trial is well established and subject only to a knowing and voluntary waiver by the defendant. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). Defense counsel's role is to advise the defendant whether to take the stand; ultimately, the defendant must decide for himself. *See Pelzer v. United States*, No. 96-1195, 1997 WL 12125, at *2 (6th Cir. Jan. 13, 1997) (citation omitted).

Respondent concedes that Petitioner properly exhausted this claim by raising it in his post-conviction proceedings and on appeal of the denial of his petition for post-conviction relief. (Doc. No. 16 at PageID# 24). The post-conviction court made no findings regarding Petitioner's decision to testify. In addressing Petitioner's right-to-testify claim, the TCCA began by stating:

> The Petitioner contends that trial counsel rendered ineffective assistance by failing to meet with the Petitioner in person before the day of trial, when they met for only thirty minutes, and by stating in open court that the Petitioner would testify before the Petitioner had made his decision. The State acknowledges that the post-conviction court made no findings regarding the Petitioner's decision to testify but argues that the record contains sufficient testimony and related findings from the

post-conviction court for this court to review the issue without remanding for specific factual findings.

*Jones*, 2020 WL 528029, at *16. The TCCA agreed with the State, finding that "[t]he record is sufficient for us to conclude that Petitioner has not proven that he was prejudiced by an any alleged deficiency in counsel's discussion with the Petitioner of his testifying." In so finding, the TCCA noted that trial counsel's assertion during his testimony that the trial court "went over *Momom*" was not reflected in the trial transcript. However, because Petitioner (1) had not testified at his post-conviction hearing that he would not have testified if he had been given more time and (2) failed to allege that he would have been acquitted if he had not testified, the TCCA found that Petitioner was not entitled to relief on this basis *Id*. at *16-17.

The TCCA's findings were not unreasonable. Petitioner testified during his post-conviction hearing that trial counsel explained Petitioner's right to testify and Petitioner was still considering his options when counsel announced in open court that Petitioner would testify. The trial transcript reflects that counsel affirmed Petitioner would testify three times, the first of which was during opening statement. Counsel discussed Petitioner's anticipated testimony and, in response to a question from the trial court, stated Petitioner would testify.

Trial counsel testified at the post-conviction hearing that he and Petitioner discussed Petitioner's right to testify, although counsel did not remember exactly when the discussion occurred, and that counsel recalled the trial court "went over *Momom*." Counsel told Petitioner that counsel needed to put him on as a witness so that Petitioner could tell the jury the drugs did not belong to him and explain why he ran from the police. Counsel wanted to humanize Petitioner for the jury and felt that the "only way to counter" the State's theory of guilt based upon Petitioner' flight from police was to have Petitioner testify. The post-conviction court found generally that

51

counsel was well-prepared in his representation of Petitioner and adequately communicated with Petitioner.

The post-conviction court implicitly discredited Petitioner's testimony on this issue. The Court "must presume that all determinations of factual issues made by the state court are correct unless the Defendant can rebut that presumption by clear and convincing evidence." *Mitchell v. Mason*, 325 F.3d 732,737-38 (6th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). This presumption includes the state courts' credibility findings. *Skaggs v. Parker*, 235 F.3d 261, 266 (6th Cir. 2001). Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination." *Rice v. Collins*, 546 U.S. 333, 341-42 (2006). A state court's credibility finding on a particular issue may be overturned by a habeas court only when "evidence on the issue[ ] raised ... is too powerful to conclude anything but" that the trial court's finding was unreasonable. *Miller-El v. Dretke*, 545 U.S. 231, 265 (2005).

The Court finds that the state court's determination was not contrary to *Strickland*. Neither was the state court's ineffective assistance determination based on an unreasonable determination of the facts or an unreasonable application of *Strickland*'s standards to those facts. Thus, Petitioner is not entitled to relief on this claim. This claim is without merit and will be dismissed.

4. Ground Four: Trial Counsel's Alleged Failure to Give Notice of Impeaching Convictions

Petitioner alleges that counsel provided ineffective assistance by failing to give Petitioner notice that his prior convictions would be used against him. (Doc. No. 6 at PageID# 53).

This claim is procedurally defaulted because Petitioner did not properly exhaust this claim to the TCCA on direct appeal, which was the first court of competent jurisdiction over the matter. As such, Petitioner waived review of the claim in state court, and the claim is procedurally

defaulted. Tenn. Code Ann. § 40-30-106(g); 28 U.S.C. § 2254(c). He therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice.

Petitioner asserts that his attorney's failures constitute cause for excusing the default. (Doc. No. 6 at PageID# 53). However, even if counsel's ineffectiveness constitutes cause, Petitioner cannot show prejudice because the claim is not substantial. As explained *supra*, Petitioner's underlying claim concerning notice of the State's intent to use Petitioner's prior convictions for impeachment has no merit. *See Dodson v. Phillips*, No. 1:16-cv-60, 2021 WL 3912794, at *28 (M.D. Tenn. Aug. 31, 2021) (finding that, since the underlying Equal Protection claim failed, "Petitioner's [sic] has not shown discrimination in the Grand Jury such that his underlying ineffective-assistance-of-trial-counsel claim is substantial"), *report & recommendation adopted and approved* (M.D. Tenn. Mar. 31, 2022). This claim is not substantial, and Petitioner has not shown that he was prejudiced by counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of Ground Four, and he has not asserted actual innocence. The claim is without merit and will be dismissed.

### 5 . Ground Five: Trial Counsel's Failure to Request a Bill of Exception

Next, Petitioner alleges that trial counsel provided ineffective assistance because he "filed a motion for a new trial w/o a transcript approving a Bill of Exception w/o requesting one where issue was that verdict was against the [pre]ponderance of the evidence." (Doc. No. 6 at PageID# 53). According to Petitioner, "[t]his made it impossible to prove anything and denied me of my constitutional right." (*Id*.) A bill of exception is a narrative "statement of the evidence or proceedings" when a transcript is unavailable for a defendant proceeding on a motion for a new

trial. (Doc. No. 6 at Page ID# 53-54); Tenn. R. App. P. 24(c); *see* W. Mark Ward, *Tennessee Criminal Trial Practice* § 10:14 n.31 (2020-2021 ed.).

This claim is procedurally defaulted because Petitioner did not properly exhaust this claim to the TCCA on direct appeal, which was the first court of competent jurisdiction over the matter. As such, Petitioner waived review of the claim in state court, and the claim is procedurally defaulted. Tenn. Code Ann. § 40-30-106(g); 28 U.S.C. § 2254(c). Therefore, he has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice.

Petitioner asserts that his attorney's failures constitute cause for excusing the default. (Doc. No. 6 at Page ID# 54). However, even if counsel's ineffectiveness constitutes cause, Petitioner cannot show prejudice because the claim is not substantial. Contrary to Petitioner's assertion, the record shows that defense counsel was able to litigate the motion for new trial as well as Petitioner's direct appeal without issue. *See Jones*, 2020 WL 528029, at *7 (noting counsel "argued for an interpretation of the relevant statute requiring proof of the intent to sell drugs inside the drug-free zone" in both the motion for a new trial and on appeal). Thus, this claim is not substantial, and Petitioner has not shown that he was prejudiced by counsel's failure to raise it. Therefore, Petitioner cannot demonstrate cause and prejudice to excuse his procedural default of Ground Five, and he has not alleged that he is actually innocent. The claim is without merit and will be dismissed.

### 6. Ground Twelve- Ineffective Assistance of Post-Conviction Counsel

In Ground Twelve, Petitioners alleges two claims: trial counsel provided ineffective assistance by "approving a bill of exception for [the] motion for a new trial without a transcript[,]" and post-conviction counsel provided ineffective assistance. (Doc. No. 6 at Page ID# 58). The

claim relating to trial counsel's effectiveness in litigating the proceedings on Petitioner's motion for a new trial was addressed *supra*.

As for Petitioner's claim of post-conviction counsel's ineffectiveness, Petitioner alleges that his post-conviction attorney "was ineffective for leaving out the things that I wanted included in my petition even tho[ugh] statu[t]e requires that it states the prejudice and all the issues." (Doc. No. 6 at PageID# 58). However, this claim is not cognizable in habeas corpus. There is no constitutional right to an attorney in state post-conviction proceedings. *Coleman*, 501 U.S. at 752 (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)); *Lynn v. Donahue*, No. 1:14-cv-01284, 2017 WL 5930304, at *10 (W.D. Tenn. Nov. 30, 2017) (dismissing habeas claims based on alleged ineffective assistance of post-conviction attorneys). Under § 2254(i), the ineffective assistance of post-conviction counsel "shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254. Consequently, Petitioner cannot claim constitutionally ineffective assistance of counsel in state post-conviction proceedings. *See Wainwright v. Torna*, 455 U.S. 586 (1982) (where there is no constitutional right to counsel there can be no deprivation of effective assistance). Ground Twelve, therefore, must be dismissed as non-cognizable in this habeas proceeding.

**F.  Ground Six – Illegal Arrest**

Relying on the Fourth and Fourteenth Amendments, in Ground Six Petitioner alleges he was illegally arrested due to an "invalid instrument of justice." (Doc. No. 6 at Page ID# 54).

This claim is procedurally defaulted because Petitioner did not properly exhaust any illegal-arrest claim to the TCCA on direct appeal, which was the first court of competent jurisdiction over the matter. (*See* Doc. No. 15, Attach. 7 at Page ID# 584-611). As such, Petitioner waived review of the claim in state court, and the claim is procedurally defaulted. Tenn. Code Ann.

§ 40-30-106(g); 28 U.S.C. § 2254(c). He therefore has waived his claim for purposes of federal habeas corpus review unless he establishes cause for the default and actual prejudice as a result of the alleged illegal arrest.

Petitioner asserts that his attorney's failures constitute cause for excusing the default. (Doc. No. 6 at PageID# 54). However, even if counsel's ineffectiveness constitutes cause, Petitioner cannot show prejudice because the claim is not cognizable. The Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976), precludes habeas review "where the State has provided an opportunity for full and fair litigation of a fourth amendment claim . . . ." *Id*. at 494.

The Sixth Circuit has articulated a two-step inquiry when determining whether a petitioner may receive a merits decision on a Fourth Amendment claim during habeas corpus review. *Riley v. Gray*, 674 F.2d 522, 526 (6th Cir. 1982). First, the district court must examine whether the state procedural mechanism presents the opportunity to raise a Fourth Amendment claim. *Id*. Second, the district court must determine whether the claim's presentation "was in fact frustrated because of a failure of that mechanism." *Id*. This inquiry focuses on whether there is "an available avenue for the prisoner to present his claim to the state courts, not an inquiry into the adequacy of the procedure actually used to resolve that particular claim." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013) (internal quotations omitted). The Sixth Circuit's approach essentially asks: "Did the state courts permit the defendant to raise the claim or not?" *Id*. at 640.

Here, Petitioner had an "opportunity for full and fair consideration" of this claim. *See Stone*, 428 U.S. at 494. Under the Tennessee Rules of Criminal Procedure, Petitioner could have filed and litigated a motion to suppress before trial. *See* Tenn. R. Crim. P. 12(b)(2). During Petitioner's post-conviction hearing, trial counsel testified that Petitioner's trial date was reset because counsel was attempting to obtain the police dispatch record of the calls Officer Lovett

56

made to Spring Hill. *Jones*, 2020 WL 528029, at *4. Counsel was searching for the records to determine if a suppression issue existed "relative to a delay during the stop." *Id*. Counsel stated that "he sometimes filed suppression motions in drug cases involving traffic stops, citing case law that held where traffic stops were prolonged in order to conduct a police dog sniff search, the evidence was suppressed." *Id*.  Ultimately, counsel did not file the motion because "he did not believe a suppression issue existed in the Petitioner's case because the officers' testimony established that Officer Lovett was still waiting for the information check to come back when the sniff search was conducted." *Id*. Thus, Petitioner had an "opportunity" to litigate a Fourth Amendment issue, but counsel elected not to do so. *See Good*, 729 F.3d at 639-40. Accordingly, this claim is defaulted and nevertheless without merit because it is not cognizable. This claim will be dismissed.

### G.  Ground Seven: Hearsay

Petitioner alleges a hearsay violation based on Tennessee Rule of Evidence 801 concerning the arresting officers' testimony. (Doc. No. 6 at Page ID# 55). Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the rule against hearsay. *See* Tenn. R. Evid. 802. The alleged hearsay referenced by Petitioner is that "Parks stated that Officer Lovett told him that I was nervous to the juror like that's why he asked me to get out [of] the vehicle." (Doc. No. 6 at PageID#55).

Even if this statement was hearsay and was admitted during Petitioner's trial, this claim is procedurally defaulted. Petitioner did not present and properly exhaust any hearsay claim to at least the TCCA on direct appeal. (*See* Doc. No. 15, Attach. 7 at Page ID# 584-611). In so doing,

Petitioner waived review of the claim in state court, thus exhausting the claim through procedural default. Tenn. Code Ann. § 40-30-106(g); 28 U.S.C. § 2254(c).

Petitioner cannot establish prejudice to excuse the default because the claim is not cognizable in habeas corpus. Relief under Section 2254 can only be based upon a violation of the United States Constitution or law or treaties of the United States. Thus, this claim must have been presented as an issue of federal constitutional law, not state law. *See Anderson v. Harless*, 459 U.S. 4, 6-7 (1982) ("It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made.") (internal citations omitted); *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984) (holding that a petitioner must have presented his claim in the state court "as a federal constitutional issue-not merely as an issue arising under state law."). A challenge to a state trial court's evidentiary ruling is a matter of state law which is not subject to federal review. *Jones*, 2010 WL 1257878, at *25. Violations of state law or procedure that do not infringe on a specific federal constitutional protection are not cognizable under 28 U.S.C. § 2254. *See Estelle*, 502 U.S. 62, 67-68.

Here, there is no evidence that the alleged statement infringed on a specific federal constitutional right. Thus, the claim raises no more than an issue of state evidentiary law which is not subject to federal habeas corpus review. Petitioner cannot satisfy the cause and prejudice requirement, and nothing in the record indicates that Petitioner can make a showing of a fundamental miscarriage of justice. Consequently, this claim must be dismissed as procedurally defaulted.

### H.  Ground Eight – Pleading Guilty Before the Jury

Next, Petitioner advances a claim entitled "Suggestive Procedural," in which he alleges that the trial court forced him to plead guilty in front of the jury. (Doc. No. 6 at Page ID# 55).

Petitioner also states that the jury was "shown a picture of [his] license and the green bottle of crack on the same sheet of paper. This is a [sic] informal way of suggesting guilt." (*Id*.) Thus, Ground Eight appears to consist of two distinct claims.

Both claims are procedurally defaulted. Petitioner did not raise either of these claims to the TCCA on direct appeal, which was the first court of competent jurisdiction that could have addressed the claims. (Doc. No. 15, Attach. 7 at Page ID# 584-611). Since Petitioner waived review of the claims in state court, Tenn. Code Ann. § 40-30-106(g), he has exhausted "the remedies available in the courts of the State" because he has no "right under the law of the State to raise, by any available procedure, the question[s] presented." 28 U.S.C. § 2254(c). Therefore, the claims are exhausted through procedural default. The Court cannot review the claims on the merits unless Petitioner establishes cause and prejudice to excuse the default.

The claim concerning the trial court fails because the record shows that the trial court did not force Petitioner to plead guilty. (*See* Doc. No. 15, Attach. 3 at Page ID# 198-99). As discussed *supra*, the record reflects that trial counsel advised Petitioner to plead guilty to the two lesser charges in front of the jury before proceeding to trial on the most serious offense to gain credibility with the jury. *See Jones*, 2020 WL 528029, at *16. The record further reflects that this decision did not involve any coercion by the trial court and Petitioner chose to plead guilty on his own volition. This claim will be dismissed.

Turning to Petitioner's second claim raised in Ground Eight, "[i]n general, alleged evidentiary errors are not cognizable." *Moreland*, 699 F.3d 908, 923. However, a federal court "may nevertheless grant relief in cases where the state's evidentiary ruling is so fundamentally unfair that it rises to the level of a due-process violation." *Id*. "To show a due process violation under AEDPA rooted in an evidentiary ruling," the Sixth Circuit "has typically required a Supreme

Court case establishing a due process right with regard to that specific kind of evidence." *Id.* (citing *Maldonado v. Wilson*, 416 F.3d 470, 477 (6th Cir. 2005)).

Here, Petitioner has not pointed to a Supreme Court case that bars the introduction of the challenged evidence. Neither does Petitioner reference a state evidentiary rule or precedent that would bar the showing of a "picture of [Petitioner's] license and the green bottle of crack on the same sheet of paper." Petitioner therefore cannot show cause and prejudice to excuse his default of the two claims raised in Ground Eight, and there is no assertion of actual innocence. These claims will be dismissed.

### I. Ground Nine - Leading Questions

In Ground Nine, Petitioner alleges that the prosecutor "was allowed to lead the entire trial[,]" which violates "Rule of Evidence 611." (Doc. No. 6 at Page ID# 56).

Petitioner did not raise any claim based on Tennessee Rule of Evidence 611 before the TCCA on direct appeal. Under Tenn. Code Ann. § 40-30-106(g), he waived state-court review of this claim, barring present and future litigation of the claim in state court. Thus, the claim is exhausted but procedurally defaulted.

Petitioner bases this claim solely upon a state evidentiary rule, which generally is not cognizable. *See Moreland*, 699 F.3d at 923; *see also* 28 U.S.C. § 2254(a) (habeas relief granted only for violations of the "Constitution or laws or treaties of the United States"). Petitioner's claim consists of a one-sentence conclusory allegation. Thus, Ground Nine would fail on the merits even if it were not procedurally defaulted. Petitioner also has not asserted actual innocence. The claim will be dismissed.

**J. Ground Ten – Right to an Impartial Court**

In Ground Ten, Petitioner asserts several complaints against the trial court, alleging that it was biased against the defense. (Doc. No. 6 at Page ID# 56-57). The Court notes that Petitioner reasserts claims against the trial court that he alleged in earlier grounds for relief, namely the argument that the trial court "made [Petitioner] plea[d] guilty in front of jurors" and "told the juror to call back this weekend about when we might need to use you next." The Court need not repeat its analysis with regard to those claims.

Turning to the claims that have not yet been addressed, those claims are procedurally defaulted. Petitioner did not exhaust any of the claims to the first court of competent jurisdiction. (*See generally* Doc. No. 15, Attach. 7 at Page ID# 584-611). Petitioner therefore has waived review of these claims in state court, and the claims are procedurally defaulted. Tenn. Code Ann. § 40-30-106(g); 28 U.S.C. § 2254(c). The Court will consider each of these defaulted claims in turn to determine if Petitioner has established cause and prejudice.

First, Petitioner alleges that his right to an impartial court was violation because "Judge Jones wasn't suppose[d] to" preside over Petitioner's case "[a]ccording to Rule 40.04." (Doc. No. 6 at PageID# 56). However, Petitioner's reliance on "Rule 40.04" provides no relief because this rule is a local rule of court governing the "Maury County Criminal Rotation," not the "Constitution or laws or treaties of the United States." (Doc. No. 6 at Page ID# 56); 28 U.S.C. § 2254(a); *see* R. 40.04, Twenty-Second Judicial District Trial Court Rules, p. 17, available at https://www.tncourts.gov/sites/default/files/22nd_district_rules_of_practice.pdf (last accessed June 24, 2022). Thus, this claim is not cognizable, resulting in no prejudice that could excuse the procedural default.

Petitioner also believes that he did not receive an impartial court because the trial court "asked if [he] would be testifying in front of the jurors before [his] juror out hearing." (Doc. No. 6 at Page ID# 56). Petitioner states that "[t]he fact that he [the judge] only asked if I would be testifying once doesn't excuse anything because once is all it takes." (Doc. No. 19 at PageID# 1254). This allegation, in its many variations, has been addressed ad nauseum herein. The record shows two instances where the trial court mentioned Petitioner's right to testify in his defense. The first instance occurred during opening statements, but only after trial counsel told the jury it needed "to listen carefully to [Petitioner's] testimony" to discover and judge "some discrepancies that [its] going to have to listen to between what the officers testify to and what [Petitioner] testifies to[.]" (Doc. No. 15, Attach. 3 at Page ID# 210-11). Trial counsel repeatedly told the jury during opening statements that Petitioner would testify, which evidently prompted the trial court to interject and ask whether Petitioner would take the stand. (*See id*., Page ID# 210-13). Though unusual, the trial court's question did not create any semblance of bias, "deep-seated favoritism[,] or antagonism as to make fair judgment impossible", *Liteky v. U.S*., 510 U.S. 540, 555 (1994), particularly given defense counsel's repeated representations to the jury that Petitioner would be testifying.

The second instance of the trial court inquiring into whether Petitioner would testify occurred during a jury-out hearing. During this jury-out hearing, trial counsel moved for judgment of acquittal and the parties and trial court discussed whether the jury should be instructed on "flight." (Doc. No. 15, Attach. 5 at Page ID# 454). Before making a statement about Petitioner testifying, the record shows that the trial court wanted to address certain matters "before the jury comes back in." (*Id*.) After an extended colloquy on the pending motions and requests, the trial court remarked that the parties were "ready for the jury" before the jury "entered the courtroom." (*Id*. at Page ID# 460-61). Petitioner simply has not shown that the court was biased in this way.

Next, Petitioner lists a variety of conclusory allegations against the trial court, questioning its rulings that went against the defense such as "approv[ing] impeachment," "allow[ing] the State to show jurors pic w[ith] [his] license and the crack together[,]" and "let[ting] the State include flight into instructions[.]" (Doc. No. 6 at Page ID# 56-57). But "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky*, 510 U.S. at 555, and Petitioner presents no argument beyond these conclusory allegations as to how these rulings were so outside the realm of proper decorum and decision as to establish the trial court's bias against him.

Petitioner also asserts that the trial court "switched up the dates that the officers testified on" and "used double jeopardy to secure the conviction." (Doc. No. 6 at Page ID# 56). But beyond these single-sentence statements of claims, Petitioner fails to argue how he is entitled to excuse their defaults. *See Prince*, 78 F. App'x at 442.

Next, Petitioner alleges that the trial court "restrict[ed] the jurors from there [sic] notes", and this action evidenced the trial court's bias against Petitioner. (Doc. No. 6 at Page ID# 57). Petitioner relies on a comment the trial court made to the jurors when dismissing them for lunch as evidence that the trial court unlawfully restricted them from their notes. (*See* Doc. No. 15, Attach. 6 at Page ID# 532) ("All right. You-all have a nice lunch. Remember, no investigation, no talking, wait until deliberations to do that, leave your note pads where they are, thank you."). Petitioner fails to argue how this comment demonstrated antagonism towards the defense to the point of rendering "fair judgment impossible." *See Liteky*, 510 U.S. at 555. In any event, before closing arguments, the trial court explicitly told the jury that it had "taken [its] last notes for this trial, but [it] will keep them now and *may use them during [its] deliberations*." (*See* Doc. No. 15, Attach. 6 at Page ID# 540) (emphasis added). Additionally, the jury instructions imply that the jury had access to and could consult its notes during its deliberations. (*See* Doc. No. 15, Attach. 1

at Page ID# 132) ("You were permitted to take notes during the trial. Your notes do not become your property, but will be left in the pads and will be collected and destroyed by court personnel after the jury has completed its duties."). In short, this defaulted, conclusory allegation fails to establish judicial bias towards the defense.

Finally, Petitioner accuses the trial court of wrongfully "den[ying his] post-conviction" petition because the trial court told Petitioner that he "wasn't told wrong about the [Drug-Free Zone] when he is on record at [the] trial stating there was a legitamate [sic] questions about the [Drug-Free Zone] issue." (Doc. No. 6 at Page ID# 57). Petitioner again appears to refer to the trial court's statement that it made when denying the defense's motion for judgment of acquittal, that "they're [sic] legitimate jury questions about the drug-free zone issue and maybe in some other issues as well[.]" (Doc. No. 15, Attach. 5 at Page ID# 455-56). And as explained *supra*, this statement was not a judicial finding of fact, but rather a statement of decision concerning Petitioner's motion for judgment of acquittal. In short, Petitioner's out-of-context citation to the trial court's statement does not support any allegation that the court erred when denying Petitioner's post-conviction petition.

In summary, the many claims raised in Ground Ten have been previously discussed, are procedurally defaulted, and/or lack merit based on the law and the record. These claims will be dismissed.

### K.  Ground Eleven - Constitutionality of the Drug-Free School Zone Act

Petitioner claims the Drug-Free School Zone Act[4] "is unconstitutional" because it violates the Tennessee Sentencing Reform Act of 1989 and the Eighth Amendment's prohibition against cruel and unusual punishment. (Doc. No. 6 at Page ID# 57).

---

[4] The pertinent provisions of the Drug-Free School Zone Act follow:

Petitioner failed to properly exhaust this claim to the TCCA on direct appeal, the first court of competent jurisdiction, which led to the claim's waiver in state court. *See* Tenn. Code Ann. § 40-30-106(g). Lacking any procedure to properly exhaust this ground for relief in state court, the claim is now exhausted through procedural default. 28 U.S.C. § 2254(c).

First, Petitioner cannot show prejudice to excuse his default because this claim is not cognizable to the extent Petitioner alleges the Drug-Free School Zone Act violates the "Sentencing Reform Act of 1989." The Sentencing Reform Act of 1989 is a state law, not the "Constitution or laws or treaties of the United States[,]" which renders this allegation not cognizable in these proceedings. 28 U.S.C. § 2254(a); *Estelle*, 502 U.S. at 67-68.

Second, Petitioner cannot show prejudice to excuse the default because the Tennessee Court of Criminal Appeals has upheld the constitutionality of the Drug-Free School Zone Act. *State v. Jenkins*, 15 S.W.3d 914, 919 (Tenn. Crim. App. 1999), *app. perm. denied* (Tenn. Feb. 22, 2000). Specifically, the Tennessee Court of Criminal Appeals held that the Act does not violate

---

(a) It is the intent of this section to create Drug-Free School Zones for the purpose of providing all students in this state an environment in which they can learn without the distractions and dangers that are incident to the occurrence of drug activity in or around school facilities. The enhanced and mandatory minimum sentences required by this section for drug offenses occurring in a Drug-Free School Zone are necessary to serve as a deterrent to such unacceptable conduct.

(b) A violation of § 39-17-417, or a conspiracy to violate such section, that occurs on the grounds or facilities of any school or within one thousand feet (1,000') of the real property that comprises a public or private elementary school, middle school or secondary school shall be punished one (1) classification higher than is provided in § 39-17-417(b)-(I) for such violation.

(c) Notwithstanding any other provision of law or the sentence imposed by the court to the contrary, a defendant sentenced for a violation of subsection (b) shall be required to serve at least the minimum sentence for such defendant's appropriate range of sentence. Any sentence reduction credits such defendant may be eligible for or earn shall not operate to permit or allow the release of such defendant prior to full service of such minimum sentence.

(d) Notwithstanding the sentence imposed by the court, the provisions of title 40, chapter 35, part 5, relative to release eligibility status and parole, shall not apply to or authorize the release of a defendant sentenced for a violation of subsection (b) prior to service of the entire minimum sentence for such defendant's appropriate range of sentence.

(e) Nothing in the provisions of title 41, chapter 1, part 5 shall give either the governor or the board of probation and parole the authority to release or cause the release of a defendant sentenced for a violation of subsection (b) prior to service of the entire minimum sentence for such defendant's appropriate sentence.
Tenn. Code Ann. § 39-17-432.

due process, does not violate equal protection, and does not impose cruel and unusual punishment. *Id*. at *1. And in *United States v. Cross*, 900 F.2d 66 (6th Cir. 1990), the Sixth Circuit found that drug-free school zone statutes are constitutional. *Id*. at 68-69 (holding that federal school zone statute does not violate due process or equal protection). *See also Goodrum v. Settles*, No. 1:18-cv-7, 2019 WL 1958380, at *25 (M.D. Tenn. May 2, 2019) (collecting cases), *certificate of appealability denied sub nom*., *Goodrum v. Hutchison*, No. 19-5605, 2019 WL 6606998, at *4 (6th Cir. Oct. 18, 2019). This defaulted claim must be dismissed.

## L. Ground Thirteen – Miscellaneous Claims

Ground Thirteen consists of a number of allegations, many of which were raised by Petitioner in other grounds. (Doc. No. 6 at Page ID# 58).

The claim concerning the jury's notes was previously addressed *supra*.

Petitioner's claim that "[t]hey denied [him] a copy of [his] transcript to properly prepare for trial" fails to state a violation of the "Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

In Petitioner's claim concerning the procedure the State allegedly followed regarding its request for "special jury instructions", Petitioner describes what amounts to a failure to follow state law regarding notice of the request, which is not cognizable in habeas corpus. (*See* Doc. No. 6 at Page ID# 58). In any event, Petitioner does not identify which "special jury instructions" caused this grievance, thus preventing the Court from properly evaluating the claim.

And finally, Petitioner cursorily states that "[a]ll of the things in [his] case amount to plain error." (Doc. No. 6 at Page ID# 58). Petitioner cites "Tenn. R. App. P. 36(b)" in support of plain error review. (*Id*.) But again, this citation is to a state rule of appellate procedure governing plain

error, not to the Constitution or other federal law; thus, the claim is not cognizable in this proceeding. *See* 28 U.S.C. § 2254(a). Ground Thirteen will be dismissed.

## V. CONDITIONS OF CONFINEMENT ALLEGATIONS

In various filings with the Court after the submission of the operative habeas petition, Petitioner includes allegations concerning the conditions of his confinement. (*See e.g.*, Doc. No. 18 & 20). If Petitioner wishes to pursue federal civil rights violations, he must do so by filing a complaint and initiating a separate civil action. The filing fee for a federal civil rights action is $402. Conditions of confinement claims are not appropriately raised within a habeas corpus petition.

## VI. CONCLUSION

For the reasons set forth herein, the pro se petition filed by Taboris Jones seeking relief under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. 322, 327. The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Petitioner's claim, the

Court will deny a COA.

An appropriate Order will be entered.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE